Page 1

1

2  UNITED STATES DISTRICT COURT

   SOUTHERN DISTRICT OF NEW YORK

3  -----------------------------------------X

   STEVEN A. CUCULICH, as Trustee of Inter

4  Vivos Tr! II FBO The Cuculich Family,

5                            Plaintiff,

            -against-        Case No.

6                            1:21-cv-6752-SLC

7  JOHN Z. RIGOS,

8                            Defendant.

   -----------------------------------------X

9

10                DATE: December 19, 2022

11                TIME: 11:00 a.m.

12

13

14          EXAMINATION BEFORE TRIAL of a

15  Nonparty Witness, ROCCO DiSPIRITO, taken by

16  the Plaintiff, pursuant to a Subpoena, held

17  via virtual Zoom, before Francine Delfino,

18  a Notary Public of the State of New York.

19

20

21

22

23

24

25

Page 2

```
1
2   A P P E A R A N C E S:
3
4   MOREA SCHWARTZ BRADHAM FRIEDMAN & BROWN,
    LLP
5      Attorneys for the Plaintiff
       444 Madison Avenue, 4th floor
6      New York, New York 10022
       BY: JOHN BRADHAM, ESQ.
7
8
    MORICI & MORICI, ESQS.
9      Attorneys for the Defendant
       One Grand Central Place, Suite 2450
10     New York, New York 10165
       BY: GERARD MORICI, ESQ.
11
12
    BAILEY LAW, P.C.
13     Attorneys for the Nonparty Witness
       3434, 485 Underhill Blvd, #308
14     Syosset, New York 11791
       BY: EDWARD BAILEY, ESQ.
15
16
    ALSO PRESENT:
17     John Z. Rigos, Defendant
18
19            *         *         *
20
21
22
23
24
25
```

Page 3

1

2    F E D E R A L   S T I P U L A T I O N S

3

4

5    IT IS HEREBY STIPULATED AND AGREED by and

6    between the counsel for the respective

7    parties herein that the sealing, filing and

8    certification of the within deposition be

9    waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20   IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24              *     *     *     *

25

Page 4

```
 1                      R. DiSPIRITO
 2    R O C C O   D i S P I R I T O, called as a
 3    witness, having been first duly sworn by a
 4    Notary Public of the State of New York, was
 5    examined and testified as follows:
 6    EXAMINATION BY
 7    MR. BRADHAM:
 8         Q.    Please state your name for the
 9    record.
10         A.    Rocco DiSpirito.
11         Q.    What is your present address?
12         A.    511 Avenue of the Americas,
13    Suite 367, New York, New York 10011.
14              MR. BAILEY:  John, before we
15         begin I want to put a statement on
16         the record.
17              For the record, as counsel for
18         the witness individually, the other
19         counsel are aware that there was back
20         and forth with the bankruptcy
21         attorneys regarding the filing for
22         Chapter Eleven of the tenant in this
23         case, Flavorworks Trucks LLC, and it
24         was decided among that bankruptcy
25         counsel that the deposition today
```

                    R. DiSPIRITO

1
2        could go forward.  However, the scope
3        of the examination was not discussed,
4        so I want to say Mr. Bradham on the
5        record that I'm not going to object
6        to any questions that I think are
7        racing an issue as to that or
8        certainly not going to direct him not
9        to answer, but I did want to point
10       out on the record that any questions
11       from you that veer into areas
12       prohibited by the automatic state,
13       the risk is on you and the
14       consequences would be on you and not
15       on me for not objecting, and that's
16       what I wanted to say.
17              MR. BRADHAM:  I will briefly
18       address that before I begin.  As I
19       said from the beginning,
20       Mr. DiSpirito is not in bankruptcy.
21       There's very clear Southern District
22       of New York law that says that we can
23       proceed even though an entity that he
24       is involved with is in bankruptcy and
25       I believe that case law was shared

```
                                                    Page 6
 1                      R. DiSPIRITO
 2          with one of Mr. DiSpirito's entities'
 3          bankruptcy counsel.
 4        Q.    If we can go ahead and proceed
 5   if there's nothing else, Mr. DiSpirito, my
 6   name is John Bradham and I will be taking
 7   your deposition this morning.  We're all on
 8   video here and we already have had one
 9   technical problem so it's very important to
10   try to speak clearly so that we can all
11   hear you.  If you don't hear my questions
12   or understand them just tell me that and I
13   will be happy to repeat it or explain it to
14   you.  If I don't hear you I may ask you to
15   repeat what you said or have the court
16   reporter bring it back.  If you need to
17   take a break at any time just let me know
18   and with that, let's go ahead and get
19   started.
20             Have you previously been
21   deposed in any other matters?
22        A.    Yes.
23        Q.    Can you tell me what matters
24   those were?
25        A.    Yes, in a estate administration
```

```
                                          Page 7
 1                  R. DiSPIRITO
 2   case about six years ago in the Surrogate's
 3   Court.
 4        Q.    Sorry, what was the caption of
 5   the case?
 6        A.    Sorry, I don't remember what
 7   that caption would be.
 8        Q.    What did the case concern?
 9        A.    The administration of my
10   mother's estate.
11        Q.    Okay, an estate case?
12        A.    Yes.
13        Q.    Is that the only case legal
14   proceeding in which you ever have been
15   deposed in?
16        A.    In my entire life, is that what
17   you mean?
18        Q.    Yes.  Any time during your
19   existence.
20        A.    I have by deposed before.
21        Q.    You have or haven't?
22        A.    I have.
23        Q.    Can you tell me just any other
24   time you have been deposed.
25        A.    Partnership issue I think in
```

```
                                      Page 8

 1                   R. DiSPIRITO

 2   2002.

 3        Q.    Was it a case, a lawsuit?

 4        A.    A lawsuit.

 5        Q.    What was the name of the

 6   lawsuit?

 7        A.    I don't remember.

 8        Q.    What was the nature of your

 9   involvement in the lawsuit; were you a

10   party?

11        A.    Yes.

12        Q.    Were you a Plaintiff or a

13   Defendant?

14        A.    Is it possible to be both?  I

15   think I was both.  I think there was a suit

16   and a countersuit.

17        Q.    Sorry?

18        A.    There was a suit and a

19   countersuit, so I don't know what that

20   technically makes me.

21        Q.    Well, initially you have to be

22   either a Plaintiff or a Defendant.  A

23   Plaintiff is the one who brings a lawsuit,

24   a Defendant is the one who gets sued.

25   Defendants can bring a counterclaim but you
```

```
                                        Page 9
 1                 R. DiSPIRITO
 2    were a Plaintiff or a Defendant?
 3         A.    I think I was a Plaintiff
 4    first.
 5         Q.    Where was the lawsuit filed?
 6         A.    In New York City.
 7         Q.    State or Federal Court?
 8         A.    I don't remember.
 9         Q.    Do you remember the name of the
10    other party?
11         A.    Yes, it was Jeffery Chodorow.
12         Q.    Jeffrey Chodorow?
13         A.    Yes.
14         Q.    Have you been deposed in any
15    other cases?
16         A.    Not that I can recall, no.
17         Q.    Other than the surrogate case
18    you mentioned, the estate case, and the
19    case brought with Jeffrey Chodorow, have
20    you been a party to any other lawsuits?
21         A.    I don't think so, no.
22         Q.    Have you testified in court in
23    any cases?  That's different than a
24    deposition.
25         A.    In the 2002 case there was a
```

1                    R. DiSPIRITO

2    court hearing where I believe I gave

3    testimony.  I'm not sure if hearing is the

4    same as testimony.  But I was asked

5    questions in a public proceeding.

6         Q.    In a courtroom?

7         A.    Yes.

8         Q.    Other than that, have you

9    testified in court before?

10         A.    I don't think so.

11         Q.    Have you ever been a party to

12    what is called an arbitration which is a

13    private litigation that occurs outside of

14    the courtroom?

15         A.    I think the same case that I

16    referenced earlier ended with an

17    arbitration.  I believe it did.  No,

18    actually, I don't remember, but I remember

19    something about an arbitration.

20         Q.    When you say the same case, are

21    you referring about the case with Chodorow?

22         A.    Yes.

23         Q.    So you can't remember if that

24    was an arbitration or a case filed in

25    court?

```
                                      Page 11
 1                 R. DiSPIRITO
 2         A.    It was a case filed in court,
 3   but I just can't remember, but I believe it
 4   was sent to arbitration.
 5         Q.    What do you currently do for a
 6   living?
 7         A.    I'm a chef.
 8         Q.    Explain that a bit more.  How
 9   do you make money as a chef?  Are you
10   working in a restaurant, do you own a
11   restaurant?
12         A.    I work in restaurants, I own a
13   food delivery business, I write cookbooks,
14   I appear on television, I consult.
15         Q.    Have you discussed this
16   deposition today with anyone other than
17   your attorney?
18               MR. BAILEY:  Attorneys plural.
19         A.    My attorneys, and I told my
20   wife I was attending this today.
21         Q.    Sorry, can you repeat that?
22         A.    My attorneys, and I told my
23   wife I was attending this today.
24         Q.    So just your attorneys and your
25   wife, correct?
```

```
 1                  R. DiSPIRITO
 2       A.    Yes.
 3       Q.    Have you discussed this lawsuit
 4  today with anyone other than your attorney
 5  or your wife?
 6       A.    Not that I can recall.
 7       Q.    Have you discussed this lawsuit
 8  with John Rigos?
 9       A.    Yes.
10       Q.    What did you discuss with
11  Mr. Rigos?
12       A.    We discussed general
13  information about the lawsuit, the
14  substance of the lawsuit.
15       Q.    How many times have you
16  discussed the lawsuit with Mr. Rigos?
17       A.    I can't remember but, you know,
18  more than five times.
19       Q.    Do you recall beyond what you
20  told me the substance of any of those
21  discussions?
22       A.    Yes, to some degree, I don't
23  know with what accuracy, but we discussed
24  issues like representation, how the
25  bankruptcy intersects with it, things like
```

```
                                        Page 13
 1                  R. DiSPIRITO
 2    that.
 3        Q.    Do you recall anything else
 4    about those discussions that you can tell
 5    me?
 6        A.    No, not at the moment, no.
 7        Q.    Have you discussed this lawsuit
 8    with Mr. Cuculich, who is a part of the
 9    Plaintiff?
10        A.    I don't think we have actually.
11        Q.    So I want to show you the
12    subpoena pursuant to which we're here.
13    It's a Subpoena to Testify At Deposition in
14    a Civil Action Rocco DiSpirito.
15              MR. BRADHAM:  Ed, do you have
16         that?
17              MR. BAILEY:  Yes.
18        Q.    Prior to today have you seen
19    this subpoena?
20        A.    I believe so.
21        Q.    When did you previously see it?
22        A.    I don't remember when, but I
23    feel like I have seen it.
24        Q.    You don't recall when?  Do you
25    recall what month?
```

1                      R. DiSPIRITO

2         A.      No, I believe it was in the

3    last year, though, in 2022.

4         Q.      How did you come to see it?

5         A.      My recollection is that it was

6    in an E-mail from my attorneys at the time.

7         Q.      When you say, "my attorneys",

8    what attorney are you referring to?

9         A.      I should say my former attorney

10   Ackerman.

11        Q.      When you say your former

12   attorneys, did they represent you

13   individually or did they represent one of

14   your entities?

15        A.      I think both.

16        Q.      They represented you both

17   individually and they also represented the

18   Flavorworks entity?

19                MR. BAILEY:  Asked and

20         answered.  You may answer.

21        A.      Yes.

22        Q.      So they E-mailed you the

23   subpoena?

24        A.      Yes.

25        Q.      Do you remember what month that

```
 1                    R. DiSPIRITO
 2   was?  Was it July?
 3        A.    I'm sorry, I don't remember.
 4        Q.    Did you make any response to it
 5   once you had received it?
 6             MR. BAILEY:  I will caution the
 7         witness not to reveal anything about
 8         the contents or substance of any
 9         discussions between you and your
10         prior attorneys.  Do you understand
11         that, Mr. Witness?
12             THE WITNESS:  Yes.
13        Q.    So let's be clear.  You have
14   had a lot of different attorneys for
15   different things.  You're here testifying
16   in your individual capacity and if an
17   attorney was representing you when I asked
18   you these questions I don't want to know
19   what you discussed with your attorney, but
20   what I'm trying to get at is what you did
21   beyond that.  So other than any discussions
22   you had with your attorney, I would like to
23   know what you did when you received the
24   subpoena?
25        A.    I don't remember.
```

```
                                        Page 16

 1                    R. DiSPIRITO

 2        Q.    You didn't respond to it in any

 3   way?

 4              MR. BAILEY:  Objection to form.

 5         You may answer.

 6        A.    I honestly don't remember.

 7        Q.    Did you know at the time when

 8   you received that that it required you to

 9   appear for a deposition on July 28?

10              MR. BAILEY:  Objection to form.

11         You may answer.

12        A.    I don't -- I'm not sure what I

13   thought it meant.  I honestly just took

14   advice from my attorneys and they were

15   handling it as far as I knew and that's all

16   I knew.

17        Q.    And those attorneys would be

18   the Ackerman firm?

19        A.    Yes.

20              MR. BRADHAM:  Ed, if you can

21         hand him the second subpoena which is

22         the subpoena to Flavorworks Trucks

23         LLC, the subpoena duces tecum.

24              MR. BAILEY:  Got it.

25        Q.    Prior to today, Mr. DiSpirito,
```

```
 1                    R. DiSPIRITO
 2   have you ever seen this subpoena before?
 3         A.    Is this different than the last
 4   one?
 5         Q.    Yes.  The last one was a
 6   subpoena to you as an individual.  This is
 7   --
 8         A.    Okay.  I don't remember seeing
 9   this.
10         Q.    You don't recall ever seeing it
11   before?
12         A.    That's correct.
13               MR. BRADHAM:  I would like to
14           mark the first subpoena which is the
15           Subpoena to Testify At a Deposition
16           in a Civil Action Rocco DiSpirito as
17           Exhibit 1.  And then the second
18           subpoena which is Subpoena to Produce
19           Documents Directed to Flavorworks
20           Trucks LLC is Exhibit 2.
21               (Whereupon, the aforementioned
22           documents were deemed marked as
23           Plaintiff's Exhibits 1 and 2 for
24           identification as of this date by the
25           Reporter.)
```

```
 1                    R. DiSPIRITO
 2        Q.    So, Ed, could you show
 3   Mr. DiSpirito the agreement of the lease?
 4             MR. BAILEY:  So it's annexed to
 5          there.
 6             THE WITNESS:  Okay.
 7        Q.    So what we should be looking at
 8   is the Agreement of Lease, and it's
 9   actually marked as Exhibit 1 for the
10   deposition of Mr. Rigos.
11        A.    Okay.
12             MR. BRADHAM:  We will mark that
13          as Exhibit 3 for today.
14             (Whereupon, the aforementioned
15          document was marked as Plaintiff's
16          Exhibit 3 for identification as of
17          this date by the Reporter.)
18        Q.    I would like to go to the last
19   page of it.  This is your signature,
20   correct, under Flavorworks Trucks LLC?
21        A.    Yes, that's my signature.
22        Q.    And then John Rigos served as
23   the guarantor of this lease, correct?
24        A.    That's what it says here, yes.
25        Q.    Well, is that consistent with
```

```
                                        Page 19
 1                  R. DiSPIRITO
 2    your recollection?
 3         A.    Yes.
 4         Q.    How do you know Mr. Rigos?
 5         A.    Through mutual friends.
 6         Q.    Sorry, say again?
 7         A.    Mutual friends.
 8         Q.    So you met Mr. Rigos through
 9    mutual friends before he became the
10    guarantor of this lease?
11         A.    Yes, that's correct.
12         Q.    What was the nature of your
13    relationship with him; did you become
14    business partners, friends, if you could
15    explain that to me?
16         A.    I would say it was a friendly
17    relationship, where some business was
18    discussed.
19         Q.    The business that you
20    discussed, did it concern his involvement
21    in any of your businesses?
22         A.    I would say it mostly concerned
23    new business ideas that we were discussing.
24         Q.    How did Mr. Rigos come to be
25    the guarantor of this lease?
```

```
                                          Page 20
 1                  R. DiSPIRITO
 2            MR. BAILEY:  I will object to
 3         form.  You may answer if you
 4         understand the question.
 5       A.    I asked him I think.  I think I
 6   asked him.
 7       Q.    So you asked him, you asked
 8   Mr. Rigos to be the guarantor?
 9       A.    Yes.
10       Q.    Why did you do that?
11       A.    Because I needed a guarantor
12   and he was a person that I thought I could
13   ask.
14       Q.    Why did you think you could ask
15   him?
16       A.    I'm not sure why I thought
17   that.  I asked him, after some discussion
18   he agreed.
19       Q.    Do you recall that discussion?
20       A.    Not really, no.  I mean I
21   probably can recall some parts of it but I
22   doubt with any accuracy.  It was a while
23   back now.
24       Q.    And the discussion you referred
25   to, was it one discussion or multiple
```

```
 1                    R. DiSPIRITO
 2   discussions?
 3        A.    I think it was multiple.
 4        Q.    And you can't recall anything
 5   about these discussions, is that what you
 6   are telling me?
 7        A.    Not with accuracy, no.
 8        Q.    Give me your best recollection
 9   of these discussions.
10        A.    Okay.  I likely told him I was
11   looking at this lease and that the landlord
12   was requiring a guarantor and would he
13   consider being the guarantor.  That's
14   probably what happened.
15        Q.    Did he just agree right away or
16   was it a continued discussion?
17        A.    I think he agreed pretty
18   quickly if I remember correctly.  I think
19   he agreed.  What's right away?  In the same
20   conversation, maybe in one or two more
21   conversations.
22        Q.    Did you ask anyone else to be
23   the guarantor prior to Mr. Rigos?
24        A.    I may have.
25        Q.    Do you recall?
```

```
                                           Page 22
 1                   R. DiSPIRITO
 2        A.     Not really, no.
 3        Q.     Why do you understand Mr. Rigos
 4   agreed to guarantee the lease?
 5        A.     He's a nice guy.  He's a nice
 6   person.  He wanted to be helpful.
 7        Q.     Did he explain to you why he
 8   wanted to be helpful?
 9        A.     I don't think so.  He's
10   generally a very helpful person.
11        Q.     Has the nature of your
12   relationship with Mr. Rigos changed since
13   he signed the lease as guarantor?
14        A.     Since signing the lease as
15   guarantor, I don't think it changed very
16   much.
17        Q.     Can you repeat that?
18        A.     Since signing the lease as
19   guarantor I don't believe it's changed very
20   much.
21        Q.     Why didn't you guarantee the
22   lease?
23        A.     I'm not sure.  I can't remember
24   why.
25        Q.     Do you recall telling Mr. Rigos
```

```
 1                    R. DiSPIRITO
 2   that you couldn't because you were a
 3   celebrity and you, therefore, couldn't
 4   release your financial statements?
 5        A.    I mean it sounds familiar.  I
 6   don't know that -- I can't recall the
 7   conversation but sounds like something I
 8   might have said.
 9        Q.    Have you had any recent
10   discussions, meaning in the last year, with
11   Mr. Rigos about this guarantee?
12        A.    Yes.
13        Q.    Tell me about these
14   discussions; how many were there?
15        A.    Five to ten discussions.
16        Q.    Tell me everything you remember
17   about these discussions.
18        A.    It's mostly to do with the
19   lawsuit.
20        Q.    What did you discuss with him?
21        A.    Matters about the lawsuit,
22   plans to work things out, he asked if I was
23   able to pay the arrears, sort of generally
24   what the plan is.
25        Q.    So you said you discussed
```

```
1                    R. DiSPIRITO
2    matters about the lawsuit.  What matters
3    about the lawsuit did you discuss?
4         A.    The fact that there is a
5    lawsuit, his involvement in the lawsuit,
6    whether or not I would be able to work
7    things out with the landlord, that sort of
8    thing.
9         Q.    Did he express any opinion
10   about his involvement in the lawsuit?
11        A.    He's generally unhappy about
12   it.
13        Q.    Did you give him any assurances
14   about the lawsuit?
15        A.    To the extent that I could
16   provide assurances, I may have, yes.
17        Q.    Do you recall any of those?
18        A.    Not specifically.
19        Q.    You said you discussed plans to
20   work things out, what plans did you
21   discuss?
22        A.    Generally the ability or
23   willingness to work things out with the
24   landlord.
25        Q.    Did you tell him that you were
```

1                        R. DiSPIRITO

2    going to do that?

3        A.    I don't remember if I told him

4    that specifically, but I imagine I told him

5    I would try to work things out because I

6    generally try to work things out.

7        Q.    Did you try to work things out

8    with the landlord?

9        A.    After the lawsuit the firm at

10   Ackerman took over all the discussions with

11   the landlord and I left it to them to try

12   to work things out, but I definitely hoped

13   that they would work things out and

14   generally felt like we should try to work

15   things out.

16       Q.    Did you do anything yourself

17   other than delegating to the lawyers to

18   work it out?

19       A.    I may have reached out to the

20   landlord, I don't remember.  I'm not sure

21   if it was before or after the lawsuit.

22       Q.    The other thing you said you

23   discussed with Mr. Rigos was whether you

24   could pay the arrears, what did you discuss

25   about that?

1                      R. DiSPIRITO

2          A.     I don't remember the specifics

3     but I believe we discussed generally

4     whether or not I could pay the arrears

5     and/or whether or not Flavorworks Trucks

6     could pay the arrears and come to some

7     agreement with the landlord.

8          Q.     Sorry, can you repeat the last

9     statement.

10         A.     Come to some agreement with the

11    landlord.

12         Q.     Did you tell Mr. Rigos that you

13    could pay the arrears?

14         A.     I don't think I said that.

15         Q.     Did you tell him you were going

16    to pay part of them or work things out with

17    the landlord?  What did you tell him?

18         A.     Generally I think I spoke about

19    that sort of effort, I don't remember

20    specifically what I told him.  I think I

21    generally spoke about how to make things --

22    you know, get up to date to make things

23    okay with the landlord.

24         Q.     What things did you tell him

25    you were going to do to make things okay

```
                                            Page 27
 1                    R. DiSPIRITO
 2   with the landlord?
 3        A.    I don't remember specifically
 4   but, you know, probably work out an
 5   arrangement and pay some of the arrears and
 6   in the hopes of a larger arrangement.
 7        Q.    Did you try to make some kind
 8   of arrangement to work things out and pay
 9   some of the arrears?
10        A.    I asked my attorneys to.  I
11   believe they did try to work things out,
12   yes.
13        Q.    Other than delegating to your
14   attorneys, did you try to do anything?
15        A.    At what time?  At what point?
16        Q.    At any point.
17        A.    Yes, there were many times
18   where I spoke to the landlords to try to
19   work things out.
20        Q.    So let's go through that.  Tell
21   me about your discussion, and by the
22   discussions with the landlord you are
23   referring to Steven Cuculich, right?
24        A.    Yes.
25        Q.    Did you tell Mr. Rigos about
```

```
 1                  R. DiSPIRITO
 2   these discussions with Mr. Cuculich?
 3        A.    I imagine I told him about
 4   some, I don't remember which ones I told
 5   him about.
 6        Q.    Tell me about any discussions
 7   you had with Mr. Cuculich.  How many times
 8   did you talk to him to try to work things
 9   out?
10        A.    A dozen or more times.
11        Q.    Tell me everything that you
12   remember about these communications.
13        A.    I don't remember any specifics,
14   but I can say in general we talked about
15   making payments, catching up on payments,
16   that sort of thing.
17        Q.    Did you tell him that you are
18   going to make payments and catch up on
19   payments?
20        A.    Yes, at times I did, yes.
21        Q.    Did you actually do that?
22        A.    Not every time, no.
23        Q.    Did you catch up on some
24   payments?
25        A.    Over the course of the lease,
```

```
1                    R. DiSPIRITO
2  yes, I at times caught up on payments, yes.
3       Q.    When is the last time you did
4  that?
5       A.    I don't remember, but
6  pre-pandemic probably.
7       Q.    You said pre-pandemic?
8       A.    Yes, I said pre-pandemic.
9       Q.    Do you recall when the last
10 time you spoke to Mr. Cuculich was?
11      A.    Yes, I think it was this past
12 summer.
13      Q.    What do you recall about that
14 conversation?
15      A.    Mr. Cuculich wanted to visit
16 the space with an insurance broker and he
17 came and he visited the space with an
18 insurance broker and we had a conversation
19 while he was there about this in general,
20 this lawsuit and arrears in general and I
21 don't remember if we specifically discussed
22 a plan or not, but we discussed things in
23 general, the lawsuit and the general
24 situation.
25      Q.    Do you remember any specifics
```

```
 1                    R. DiSPIRITO
 2   of that conversation?
 3        A.    I remember he was very focused
 4   on getting insurance and he sort of went
 5   through his legal strategy and what his
 6   plans were for moving forward with lawsuits
 7   and there were other things we discussed, I
 8   just can't remember with any accuracy.
 9        Q.    Do you remember any specific
10   things Mr. Cuculich said to you in any of
11   your communications with him about the
12   lease and your arrears?
13        A.    Yes, some specifics.  He would
14   talk about arrears and we can do to catch
15   up, payment plans, his opinion about the
16   business not being retail came up a lot.
17   He would try to advise me on how to proceed
18   with business to improve the situation.
19   Mostly suggesting that we use the space for
20   retail purposes, that was one big note I
21   remember fairly well.
22        Q.    Sorry, he suggested that you
23   use the space for retail purposes?
24        A.    Yes.
25        Q.    What exactly did tell you about
```

                        R. DiSPIRITO

1
2   that?
3        A.    I remember he said that the
4   model didn't work and that it's a retail
5   space, should be used for retail and just
6   his general discontent with the fact that
7   it wasn't being used for retail.
8        Q.    And you never used the space
9   for retail, did you?
10       A.    Not for the kind of retail he
11  was discussing.  He meant, you know, open
12  the doors to the people on the street
13  retail.  We used it for direct consumer
14  retail, which is slightly different.
15       Q.    But you never had consumers
16  actually coming to the space, correct?
17       A.    Correct.  That's correct.
18       Q.    Do you remember anything else
19  that Mr. Cuculich told you during these
20  discussions?
21       A.    He mentioned he had two lawyers
22  in his family.  He mentioned that he tried
23  to help his tenants as an advisor
24  frequently.  He would occasionally ask for
25  my product that I made, some shake powder

```
 1                    R. DiSPIRITO
 2   that I made.  I would send them it to him.
 3        Q.    Anything else you remember him
 4   telling you?
 5        A.    I would just be guessing at
 6   this point.
 7        Q.    At the time Mr. Rigos
 8   guaranteed the lease were you and he
 9   discussing other business ventures?
10        A.    We were generally discussing
11   ventures.  Well, this was a venture we were
12   discussing.  This venture that took place
13   in this space is a venture that we were
14   discussing.
15        Q.    So when you say you were
16   discussing it, were you discussing the
17   prospect of him being involved in the
18   business?
19        A.    Yes.
20        Q.    So just to be clear, you were
21   discussing the possibility of him being
22   involved in Flavorworks Trucks, the tenant?
23        A.    Well, we called it -- there is
24   a different name for it and it was a very
25   specific segment of the overall businesses
```

R. DiSPIRITO

1

2    I was involved in.  I don't remember if it

3    was Flavorworks Trucks at the time or not.

4    That was a new entity that was set up for

5    this space.  So it might have been called

6    something else but it was generally the

7    business of creating healthy meals and --

8    creating healthy custom meals and

9    delivering them to people at home.

10        Q.    And that's the business you

11   were operating at the premises that are the

12   subject of this lease that's Exhibit 3,

13   correct?

14        A.    It was a newer iteration of the

15   business we were discussing, so it wasn't

16   the exact same business, but yes, a version

17   of that business was what I ended up

18   executing from this space.

19        Q.    And you understand when we talk

20   about the lease here that the space we're

21   talking about 45-13 Broadway, Astoria,

22   New York, right?

23        A.    Yes, that's correct.

24        Q.    So at the time Mr. Rigos

25   guaranteed the lease, you and he were

```
 1                    R. DiSPIRITO
 2   discussing he be involved with you in
 3   business, in a business that was some
 4   variation of the business you were
 5   discussing at these premises?
 6        A.    I believe the discussions came
 7   before there were premises.  So just for
 8   chronological order sake we were discussing
 9   a business that involved delivering healthy
10   meals to people and then these premises
11   came after.
12        Q.    So you had discussions with
13   Mr. Rigos about him being involved in
14   business for you and the business of
15   delivering healthy meals to people,
16   correct?
17        A.    Yes.
18        Q.    And that was prior to the time
19   that this lease came up, right?
20        A.    Yes.
21        Q.    And then at this lease you
22   actually -- the business that was conducted
23   there was preparing healthy meals to
24   deliver to people, correct?
25        A.    Yes.
```

```
 1                    R. DiSPIRITO
 2        Q.    So at the time he guaranteed
 3   the lease there were discussions about him
 4   being involved in that business?
 5        A.    More or less.  I don't remember
 6   the exact order of things, but at some
 7   point he was no longer a part of those
 8   discussions and I can't remember what
 9   happened and in what order, but it may have
10   been the case that he was no longer a part
11   of the discussions about being a part of
12   the business but was willing to guarantee
13   the lease.
14        Q.    So, let's be clear, you know
15   you had discussions with Mr. Rigos about
16   him being involved in business with you and
17   the same thing of business you operated at
18   the premises, correct?
19        A.    Yes.
20        Q.    And you just don't recall the
21   exact timing of those discussions?
22        A.    Right.  Which came first or
23   which came after, I don't recall right now.
24        Q.    But you believe those
25   discussions came prior to the time you
```

```
                        R. DiSPIRITO
 1
 2    actually entered into the lease, right?
 3         A.    Yes.
 4         Q.    You just don't remember when
 5    they ended?
 6         A.    That's correct.
 7         Q.    Why did those discussions end?
 8         A.    A lot of reasons.  I think it
 9    was one of those situations where people
10    talk about working together and then it
11    just doesn't materialize.
12         Q.    So ultimately did he ever
13    present a reason why he didn't want to
14    invest work with you?
15         A.    I don't think so.
16         Q.    So ultimately you and Mr. Rigos
17    never went into business together?
18         A.    That's right.
19         Q.    So turning to the premises in
20    the business that operated there,
21    Flavorworks Trucks LLC doing business as
22    A Delicious Life by Rocco DiSpirito, was
23    that one of the businesses that you
24    discussed Mr. Rigos being involved in?
25         A.    Yes.
```

```
                                        Page 37
 1                    R. DiSPIRITO
 2          Q.    I'm just going to call it
 3    Flavorworks Trucks for shorthand, do you
 4    understand that I'm referring to the tenant
 5    of this lease?
 6          A.    Yes.
 7          Q.    So you and Mr. Rigos discussed
 8    his being involved in Flavorworks Trucks
 9    but ultimately that did not occur?
10          A.    Yes.
11          Q.    What does Flavorworks Trucks
12    do?
13          A.    Flavorworks Trucks is the
14    business that provides healthy meal service
15    delivery to people who live in New York
16    City and beyond.
17          Q.    And the meals were being
18    prepared at the premises 45-13 Broadway in
19    Astoria?
20          A.    Yes.
21          Q.    And then they were delivered to
22    clients that wanted them?
23          A.    Yes.
24          Q.    And you never operated a
25    restaurant at the premises 45-13 Broadway
```

Page 38

```
 1                    R. DiSPIRITO
 2   in Astoria, correct?
 3       A.    That's correct, no restaurants.
 4       Q.    So it was purely a meal
 5   delivery business?
 6       A.    Yes.
 7       Q.    Did you ever have any
 8   government permits for your operations at
 9   the premises, 45-13 Broadway?
10       A.    Which government permits?
11       Q.    Well, did you have any
12   government permits?
13       A.    I don't think so.
14       Q.    Is Flavorworks Trucks still
15   operating at the premises?
16       A.    Yes.
17       Q.    And so it's still preparing
18   meals and delivering them to customers?
19       A.    Yes.
20       Q.    Did it ever suspend or cease
21   operations at the premises?
22       A.    Yes.  There were times where we
23   needed to suspend operations mostly due to
24   Covid.
25       Q.    You said, "mostly due to
```

Page 39

                    R. DiSPIRITO

1
2    Covid", were there other reasons you
3    suspended operations at the premises?
4        A.    There were times where we had a
5    significant leak in the roof where we
6    couldn't operate for a few days.  There
7    were times where my clients would go on
8    vacation, there would be a few weeks where
9    we weren't required to deliver meals and
10   that's basically it.
11       Q.    You mentioned you ceased
12   operations during the pandemic, is that
13   correct?
14       A.    Yes.
15       Q.    For how long did you cease
16   operations?
17       A.    Months at a time.
18       Q.    Sorry?
19       A.    Months at a time.
20       Q.    Sorry, did you say four months?
21       A.    For months at a time, I don't
22   remember how many.  Months at a time.  Not
23   F-O-U-R, F-O-R.
24       Q.    So for months but you don't
25   recall how many months?

```
                                      Page 40
 1                 R. DiSPIRITO
 2        A.     Correct.
 3        Q.     And that was during the
 4   pandemic?
 5        A.     Yes.
 6        Q.     Why would you cease operations
 7   during the pandemic?
 8        A.     Well, there were times where we
 9   couldn't operate because of the conditions
10   during the pandemic.  There were times
11   where clients did not want deliveries
12   during the pandemic.  Times where it was
13   just too difficult to get food deliveries,
14   employees, that sort of thing.
15        Q.     The months that you mentioned,
16   do you recall what months those were?
17        A.     I don't recall exactly, but,
18   you know, likely to be March, April, May,
19   June, July, that sort of thing, of 2020.
20        Q.     One reason you suspended
21   operations during the pandemic was because
22   clients did not want the deliveries?
23        A.     Yes, they were, you know,
24   either out of town or, I mean, I didn't
25   ask, but understanding everything shut down
```

```
                                        Page 41
 1                  R. DiSPIRITO
 2   they sort of said we're done for a while.
 3   I didn't know if they were coming back at
 4   the time.  Most of them have, but it was
 5   just obvious that everything was shutting
 6   down, so, you know.
 7        Q.    Around the time of the pandemic
 8   roughly how many customers did you have?
 9        A.    Ten to fifteen.
10        Q.    Is that the most customers you
11   have had since you operated this business?
12        A.    No, in the beginning we had
13   more.  Closer to when we first started
14   there we had in the 20 to 30 range at
15   times.
16        Q.    But by the time the pandemic
17   came it was down to around ten or fifteen?
18        A.    Yes.
19        Q.    Did you ever cease operations
20   because of any kind of government mandate?
21        A.    Yes, I mean some of the ceasing
22   of operations I referred to previously also
23   was in response to the mandate.
24        Q.    What mandate?
25        A.    I'm not going to remember
```

```
                                      Page 42
 1                R. DiSPIRITO
 2   specific laws but I think there was a
 3   general mandate to cease everything for
 4   several weeks if not months in 2020.
 5        Q.    When you say, "we all agreed",
 6   who is we?
 7        A.    Just the world.  New York City.
 8   The world.
 9        Q.    But you weren't operating a
10   restaurant there, correct?
11        A.    No.
12        Q.    So are you telling me that
13   there was some government regulation that
14   required a food delivery company to cease
15   operations during the pandemic?
16        A.    Yes, it was unclear who could
17   remain open and who could not remain open
18   and we were not clear about it.
19        Q.    As you sit here today are you
20   telling me there was a government mandate
21   that food delivery companies cease
22   business?
23        A.    I can't say that.  I don't
24   remember the laws.  It was a very confusing
25   time.  I'm not going to pretend to be an
```

```
                                    Page 43
  1                R. DiSPIRITO
  2    expert on what the laws were or the
  3    mandates were and were not.
  4         Q.    You mentioned a leak, that you
  5    had to cease operations because of a leak.
  6    Is that correct?  Is that what you
  7    testified to?
  8         A.    Yes, there was a few times when
  9    the roof leaked in such a manner that we
 10    were not able to operate until we replaced
 11    it.
 12         Q.    What kinds of leaks were they?
 13         A.    Outside rain water coming in.
 14         Q.    Through the roof?
 15         A.    Yes, through the roof.
 16         Q.    How many days did you cease
 17    operations because of the roof leak?
 18         A.    I don't remember.
 19         Q.    Do you remember when that was?
 20         A.    It was several times over the
 21    course of the lease and I don't remember
 22    when.
 23         Q.    And you don't remember how many
 24    days it caused you to cease operation?
 25         A.    You know, less than ten.
```

```
1                    R. DiSPIRITO
2        Q.    Less than ten.  When you had
3   the leaks did you speak to the landlord?
4        A.    I mentioned in casual
5   conversation with the landlord I mentioned
6   the leaks.
7        Q.    What did the landlord tell you?
8        A.    I don't remember.
9        Q.    How did the leaks become
10  resolved?
11       A.    I hired several companies to
12  fix them several times.
13       Q.    Do you recall what companies
14  those were?
15       A.    By name, no, I don't recall the
16  names.
17       Q.    You don't recall the names, was
18  it the same company or different companies?
19       A.    No, typically a different
20  company.
21       Q.    Do you recall how much that
22  cost?
23       A.    Not with any accuracy.  In the
24  several thousand I think.  I don't
25  remember.
```

```
                                    Page 45
 1                R. DiSPIRITO
 2        Q.    I believe you testified as a
 3   result of these leaks you ceased operation
 4   for less than ten days?
 5        A.    I think that's correct, yes.
 6        Q.    What is your position with
 7   Flavorworks Trucks?
 8        A.    I'm a manager, I guess.
 9        Q.    You're the manager of it, of
10   the LLC?
11        A.    The manager, yes.
12        Q.    Are there other members in the
13   LLC?
14        A.    No.
15        Q.    Any officers?
16        A.    No.
17        Q.    At the business you were
18   operating at the premises, were there any
19   employees?
20        A.    Yes.
21        Q.    Who were they?
22        A.    Various people that I would
23   hire from the employee market.
24        Q.    Well, how many different
25   employees did you have?
```

```
                                        Page 46

 1                   R. DiSPIRITO
 2        A.    Over the course of since 2015?
 3        Q.    Yes, since you operated the
 4   business.
 5        A.    I don't remember.  More than
 6   twenty.
 7        Q.    How many are there now?
 8        A.    One.
 9        Q.    What is the largest number of
10   employees that were working there at one
11   time?
12        A.    Around twenty.
13        Q.    When was that?
14        A.    Closer to the beginning of the
15   lease, 2015, 2016, 2017.
16        Q.    Did you lose employees during
17   the pandemic?
18        A.    Yes.
19        Q.    How many employees did you have
20   working right prior to the start of the
21   pandemic?
22        A.    I believe it was four.
23        Q.    Prior to the pandemic you had
24   four employees?
25        A.    Yes.
```

```
                                        Page 47
 1                  R. DiSPIRITO
 2       Q.    Did any of these employees have
 3   any kind of relationship with Mr. Rigos?
 4       A.    Not that I'm aware of.
 5       Q.    How about Mr. Cuculich?
 6       A.    Did Mr. Cuculich have a
 7   relationship with Mr. Rigos?
 8       Q.    No.
 9       A.    Oh, relationship -- not that
10   I'm aware.
11       Q.    Let me clarify.  Did any of
12   your employees have any kind of
13   relationship with Mr. Cuculich?
14       A.    Not that I'm aware of.
15       Q.    So you're not aware of any
16   communications between any of your
17   employees and Mr. Rigos?
18       A.    No.
19       Q.    Or Mr. Cuculich?
20       A.    No.
21       Q.    Why were you down to four
22   employees at the time the pandemic began?
23       A.    It was just -- it's what
24   business dictated.
25       Q.    Does Flavorworks Trucks have
```

```
 1                   R. DiSPIRITO
 2  accountants?
 3       A.    Yes.
 4       Q.    Who are they?
 5       A.    Independent contractors that --
 6       Q.    Do you recall their names?
 7       A.    No.
 8       Q.    Does Flavorworks Trucks keep
 9  business records?
10       A.    Yes.
11       Q.    Where are those kept?
12       A.    In the premises mostly.
13       Q.    Did you ever show your business
14  records to Mr. Rigos?
15       A.    No, I don't recall doing that,
16  no.
17       Q.    During the times you were
18  operating the business did you have
19  discussions with Mr. Rigos about how you
20  were operating it?
21       A.    Yes, we discussed it earlier
22  that he would offer advice frequently.
23       Q.    Are you talking about
24  Mr. Rigos?
25       A.    Mr. Rigos, sorry, I thought you
```

Page 49

```
 1                    R. DiSPIRITO
 2   said Mr. Cuculich.  Not really with
 3   Mr. Rigos, not a lot of conversation, no.
 4        Q.    Has Mr. Rigos ever been to the
 5   premises?
 6        A.    Yes.
 7        Q.    How many times?
 8        A.    Around six, perhaps.  Not a
 9   hundred percent accurate.  I think about
10   six.
11        Q.    Do you recall last time he was
12   at the premises?
13        A.    I don't recall, no.
14        Q.    During these visits he had to
15   the premises what did you discuss?
16        A.    I can't recall.  Generally we
17   discussed what's going on in our lives, an
18   innovation that I'm working on, how things
19   are going with him and his business life,
20   personal life.
21        Q.    Did you have discussions about
22   him investing or being involved in the
23   business?
24        A.    Other than the original
25   discussion?
```

```
                                           Page 50
 1                    R. DiSPIRITO
 2         Q.    Sorry?
 3         A.    Other that the original
 4    discussion?  The answer is yes, but we
 5    already discussed it.
 6         Q.    So nothing in addition to what
 7    you already testified to?
 8         A.    I don't think so.
 9              MR. BRADHAM:  Ed, if you can
10         show Mr. DiSpirito the Declaration of
11         Mr. John Rigos.
12         Q.    Mr. DiSpirito, do you have a
13    document called the Declaration of John Z.
14    Rigos in front of you?
15         A.    Yes.
16              MR. BAILEY:  I am going to mark
17         this Declaration of John Z. Rigos as
18         Exhibit 4 for today.
19              (Whereupon, the aforementioned
20         document was deemed marked as
21         Plaintiff's Exhibit 4 for
22         identification as of this date by the
23         Reporter.)
24         Q.    Mr. DiSpirito, have you ever
25    seen this document before?
```

```
                                        Page 51
 1                 R. DiSPIRITO
 2         A.    I don't remember seeing this,
 3   no.
 4         Q.    Do you recall ever seeing a
 5   draft of it before?
 6         A.    No.
 7         Q.    Do you recall ever discussing
 8   it or a draft of it with anyone?
 9         A.    I don't.
10         Q.    I want to point you to
11   paragraph 3.  I will read that for the
12   record.  It says, "Flavorworks operates a
13   drinking and eating establishment at the
14   premises.  In or about March 2020
15   Flavorworks ceased it's on-premises food
16   and beverage service to comply with the
17   emergency executive orders issued by former
18   Governor Cuomo".
19              In the first sentence it states
20   that Flavorworks operates a drinking and
21   eating establishment at the premises.  Is
22   that an accurate statement?
23         A.    People use a lot of terms to
24   discuss food businesses.  I don't know what
25   constitutes an eating and drinking
```

Page 52

1                    R. DiSPIRITO
2    establish.  But if he means restaurant I
3    guess it's not accurate.  I think he meant
4    generally a food business.
5         Q.    Well, let's be clear, there's
6    no -- I mean you know what a restaurant is,
7    right?
8         A.    I think I do.  I'm not sure
9    these days to be honest with you.  I'm
10   struggling with that at this point.
11        Q.    There was no restaurant at the
12   premises as you understand it, right?
13        A.    I don't think there was a
14   restaurant there, that's right.
15        Q.    When you say you don't think
16   was, you know there wasn't a restaurant
17   there, correct?
18        A.    Yes.  I know there wasn't a
19   restaurant there, yes.
20        Q.    There was no drinking and
21   eating establishment at the premises,
22   correct?
23             MR. BAILEY:  Objection to form.
24        A.    If you mean restaurant, again,
25   there was no restaurant at the premises.

                    R. DiSPIRITO
1
2        Q.    I'm asking you specifically.
3        A.    I don't know what an eating and
4   drinking establishment is.  I don't know
5   what the legal definition of that is so I
6   would rather not comment on that.  There
7   was no restaurant there.
8        Q.    What do you understand a
9   drinking and eating establishment to be?
10       A.    I honestly don't know what that
11  means.
12       Q.    How many years have you been a
13  chef?
14            MR. BAILEY:  Objection to form.
15        Let's be nice, John.
16       A.    The definition of what a
17  restaurant is or isn't are so --
18            MR. BAILEY:  You've said
19        enough.
20            Argumentative, John.  Directing
21        him not to answer.
22            MR. BRADHAM:  Sorry, I asked
23        the witness how many years he has
24        been a chef and you are directing him
25        not to answer?

```
 1                    R. DiSPIRITO
 2              MR. BAILEY:  It's insulting.
 3         I'm directing him not to answer.
 4         You're not going to insult my witness
 5         with me sitting here.
 6              MR. BRADHAM:  I'm not insulting
 7         your witness.  Asking your witness
 8         how many years he's been a chef is a
 9         perfectly legitimate question.
10              MR. BAILEY:  That wasn't the
11         question.  That question you can ask.
12      Q.    How many years have you been a
13   chef, Mr. DiSpirito?
14      A.    About thirty years.
15      Q.    During that time you have
16   worked in many restaurants, correct?
17      A.    Yes.
18      Q.    And you are telling me today
19   you don't know what a drinking and eating
20   establishment is?
21              MR. BAILEY:  Same objection.
22         You may answer.
23      A.    I don't know what the legal
24   definition of that is.  So I would rather
25   not comment on it.
```

Page 55

```
 1                    R. DiSPIRITO
 2        Q.    I'm not asking you a legal
 3   definition.  I'm asking you what your
 4   understanding of what a drinking and eating
 5   establishment is.
 6              MR. BAILEY:  Same objection.
 7        Q.    Are you going to answer the
 8   question?
 9              MR. BAILEY:  You may answer.
10        A.    I don't have an understanding
11   of those terms.  It would be -- I would be
12   guessing.  I'm sure there's a legal
13   definition, I just don't know it.
14        Q.    So I want to be clear, you have
15   been a chef for thirty years but you don't
16   an understanding of what a drinking and
17   eating establishment is?
18        A.    No, I think the term, "drinking
19   and eating establishment", is an amorphous
20   and has many meanings and definitions and
21   is interpreted by many people to mean many
22   different things.  I think the word
23   "restaurant" has a more clear meaning and
24   if your question is was there a restaurant
25   there the answer is no.  But the drinking
```

```
 1                 R. DiSPIRITO
 2   and eating establishment, I'm not sure of
 3   what that meaning is.
 4        Q.    Were any members of the general
 5   public eating or drinking at the premises?
 6        A.    No.
 7        Q.    Did you have an on-premises
 8   food and beverage service at the premises?
 9        A.    No.
10        Q.    Do you know what emergency
11   executive orders issued by former Governor
12   Andrew Cuomo that Mr. Rigos referred to?
13        A.    I generally remember that there
14   were a number of emergency orders issued,
15   so I guess yes.  I think I know which ones
16   he is referring to.  I don't have a hundred
17   percent certainty about it.  I can't -- I
18   don't know what he meant by that.
19        Q.    You are saying you don't know
20   what he meant by that?
21        A.    I don't know which emergency
22   executive order he is referring to because
23   it's not specific, but I know there were
24   many issued.
25        Q.    Did you see operations at the
```

```
 1                    R. DiSPIRITO
 2    premises because of an emergency executive
 3    order issued by Governor Andrew Cuomo?
 4         A.    I believe I did, yes.
 5         Q.    When you say you believe you
 6    did, what is the basis of your belief?
 7         A.    The basis is there were many
 8    executive orders issued.  It was incredibly
 9    confusing to know where you stood in the
10    definitions that were sort of laid out and
11    we couldn't operate at the same time.  So
12    I'm not sure if it's directly a result of a
13    legal order issued or just people not
14    wanting to work and customers not wanting
15    to consume.  But during the time where many
16    executive orders were issued we had to
17    cease operations.
18         Q.    When you say you had to cease
19    operations, did you have to cease
20    operations because of an executive order?
21              MR. BAILEY:  Asked and
22         answered.  You may answer.
23         A.    I'm still confused about the
24    executive orders to this day that I don't
25    think I can answer you with accuracy.  It's
```

                          R. DiSPIRITO

1

2    my general belief that these orders

3    affected me and I responded to them in the

4    most earnest way possible.  I'm sure if we

5    look back now we can say, well, he could

6    have been open here or maybe need to close

7    there.  The point is that the pandemic

8    adversely affected my business in a

9    substantial way and I think that's the

10   point Mr. Rigos is trying to make.

11        Q.    Well, he actually says you were

12   complying with the emergency executive

13   orders.  Do you believe you were complying

14   -- you had to comply with any emergency

15   executive orders?

16        A.    I did believe at the time, yes,

17   I did believe at the time there were

18   emergency executive orders that I needed to

19   comply with.

20        Q.    You believe there were

21   emergency executive orders that required

22   you to cease operations?

23             MR. BAILEY:  Asked and

24        answered.

25        A.    I did, yes.

```
1                    R. DiSPIRITO
2        Q.    Today do you believe that?
3        A.    I'm not sure.  I would have to
4   discuss it with my attorneys and go back
5   and review everything.  I'm still confused
6   about everything that happened.  I can
7   barely remember what happened.  All I
8   remember is we were in a state of panic for
9   many months and struggling, struggling,
10  struggling.
11       Q.    Did you seek legal guidance on
12  wherever you had to cease operations
13  because of any emergency executive orders?
14       A.    I believe I did.
15       Q.    Do you recall what attorneys
16  you believe you sought advice from?
17       A.    I believe I used the New York
18  Hospitality organization that I'm a member
19  of.  They have a forum on line that we used
20  a lot of the time.  I believe I went by
21  that.
22       Q.    These weren't attorneys that
23  you hired?
24       A.    No.
25       Q.    So you believe you got some
```

Page 60

1                    R. DiSPIRITO

2     guidance from a forum?

3          A.    From an organization that

4     represents restaurants in New York City.

5          Q.    What's the name of that

6     organization?

7          A.    The New York Hospitality

8     Alliance.

9          Q.    When you say you got guidance

10    from them, how did you get that guidance?

11         A.    They would publish guidance on

12    an almost daily basis, send out E-mails

13    with update to the rules on an almost daily

14    basis, and I would ride those and determine

15    courses of action based on that.

16         Q.    So that you believe these were

17    E-mails that you received from them?

18         A.    Yes.

19         Q.    These were generally E-mails

20    they blasted out to members?

21         A.    I don't know what you mean by

22    general, but they were specific to the

23    pandemic and all the new laws that were

24    being enacted.

25         Q.    So these E-mails would have

```
 1                   R. DiSPIRITO
 2   gone out to numerous people other than
 3   yourself?
 4        A.    Yes.
 5        Q.    Do you recall specifically what
 6   E-mails you are referring to?
 7        A.    Not specifically, no.
 8        Q.    Did you ever discuss these
 9   E-mails with Mr. Rigos?
10        A.    I don't remember.
11        Q.    Would you ever have forwarded
12   any of these E-mails to Mr. Rigos?
13        A.    It's possible we discussed some
14   of the new rules and regulations during the
15   pandemic, I just can't remember.
16        Q.    Did you ever discuss with
17   Mr. Rigos why you ceased operations at any
18   point?
19        A.    I think those discussions
20   happen through our attorneys and I don't
21   remember the other -- if there were other
22   discussions.
23        Q.    Sorry, you don't recall if you
24   and Mr. Rigos had discussions about ceasing
25   operations?
```

```
                                      Page 62
 1                    R. DiSPIRITO
 2        A.    No, I don't recall.
 3        Q.    Let's go back to Exhibit 3,
 4    which is the lease.
 5              MR. BAILEY:  The witness is
 6         asking me for a break.  Did you have
 7         a question, John?
 8              MR. BRADHAM:  I'm sorry, you
 9         would like to take a break?
10              THE WITNESS:  Yes, please.
11              MR. BRADHAM:  Okay, let's take
12         a five-minute break.
13              (Whereupon, a short recess was
14         taken.)
15        Q.    Mr. DiSpirito, just following
16    up on what we just discussed, you never had
17    a permit to operate a restaurant at the
18    premises, correct?
19        A.    No.
20        Q.    You never had a permit for any
21    on premises food or beverage service,
22    correct?
23        A.    No.
24        Q.    I think you said Mr. Rigos
25    visited the premises approximately six
```

```
                                            Page 63
 1                   R. DiSPIRITO
 2   times?
 3        A.    Yes.
 4        Q.    I want to go back to what you
 5   marked as Exhibit 3, which is the agreement
 6   of the lease if you could just put that in
 7   front of you.
 8        A.    Okay.
 9        Q.    If you look just on the first
10   page in that first paragraph, it refers to
11   a business address of 511 Avenue of the
12   Americas, number 367, what is that?
13        A.    That's an office that I use.
14        Q.    Sorry?
15        A.    That's my office address.
16        Q.    So that's an office you use for
17   the business?
18        A.    Yes.
19        Q.    You use it for other businesses
20   too?
21        A.    Yes, I guess so, yes.
22        Q.    Would Mr. Rigos have ever come
23   to those offices?
24        A.    No, I don't think so.
25        Q.    Do you recall when the last
```

```
                                        Page 64
 1                  R. DiSPIRITO
 2   time Flavorworks Trucks paid rent under the
 3   lease?
 4        A.    I don't recall.
 5        Q.    Do you know what the amount of
 6   overdue rent currently is?
 7        A.    I don't have the exact number.
 8        Q.    Do you have an approximate
 9   number?
10        A.    I'm happy to look it up.  I
11   would rather not guess about the
12   approximate number.  Do you know it?  Do
13   you have the number?
14        Q.    You don't know to look it up.
15   I'm asking you as you sit here today do you
16   know?
17        A.    The exact number, no.
18        Q.    Do you have an approximate
19   number?
20        A.    Not really, no.
21        Q.    Who would know this?
22        A.    Attorneys, I guess, probably
23   have it in their records.
24        Q.    Are there any business people
25   other than attorneys who would know?
```

Page 65

                        R. DiSPIRITO

1

2          A.     An accountant.

3          Q.     Do you recall the name of the

4    accountant?

5          A.     Yes, Donna Shore.

6          Q.     Is she with a firm or on her

7    own?

8          A.     It's a firm.

9          Q.     Do you recall the name of the

10   firm?

11         A.     It's her name, sorry, I guess

12   -- I don't know how big the firm is.  It's

13   called Donna Shore.  Donna shore is the

14   name of both.

15         Q.     So the name of her name, the

16   individual, is Donna Shore, and the name of

17   the firm is Donna Shore?

18         A.     Yes.

19         Q.     Where is she based?

20         A.     Brooklyn, New York.

21         Q.     Did you ever discuss with

22   Mr. Rigos the amount of overdue rent?

23         A.     I'm sure I did.  I can't

24   remember but I'm sure I did.

25         Q.     You don't recall the specifics

```
                                          Page 66

 1                  R. DiSPIRITO
 2   of those communications?
 3        A.    I'm sorry, I don't.
 4        Q.    How long has Donna Shore been
 5   your accountant?
 6        A.    A couple of months.
 7        Q.    Sorry?
 8        A.    A couple of months.
 9        Q.    Was there an accountant prior
10   to Donna Shore?
11        A.    There were one or two, yes.
12        Q.    Do you recall their names?
13        A.    I don't.
14        Q.    I want to go to page four of
15   the lease, Article 6, Insurance.  Did
16   Flavorworks Trucks ever obtain insurance
17   for the premises?
18        A.    Yes.
19        Q.    When did it obtain the
20   insurance?
21        A.    Around the same time as the
22   signing of the lease.
23        Q.    Was it your understanding that
24   you complied with this Article 6 when you
25   got that insurance?
```

Case 1:21-cv-06752-SLC    Document 77-2    Filed 04/13/23    Page 67 of 108

Page 67

                        R. DiSPIRITO
1
2         A.    Yes, without reading the whole
3    article I understood that the insurance I
4    got was appropriate for my commitment in
5    this article.
6         Q.    You mentioned earlier that you
7    had discussions with Mr. Cuculich about the
8    insurance.  Is that right?
9         A.    Yes.
10        Q.    Did Mr. Cuculich agree that you
11   had the right insurance?
12        A.    No, at that time he did not
13   agree that I had the right insurance.
14        Q.    Do you recall what the
15   discussions were about that?
16        A.    Yes, he wanted to bring in an
17   insurance broker to get new insurance,
18   which he did, and the discussions were
19   about whether or not there was appropriate
20   insurance at the time.  This was I believe
21   six months ago.
22        Q.    Did he agree that there was
23   appropriate insurance as required by the
24   lease?
25        A.    He did not.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

```
                                              Page 68
 1                  R. DiSPIRITO
 2        Q.    Did he get additional
 3   insurance?
 4        A.    I don't know.  I believe he
 5   did.
 6        Q.    Sorry?
 7        A.    I believe he did.
 8        Q.    Who did you get your insurance
 9   from?
10        A.    A broker I used for many years.
11        Q.    Who was that?
12        A.    I can't remember his names.
13   But it's someone I used for many years.
14        Q.    Is he based in Manhattan?
15        A.    He's based in New Jersey.
16        Q.    Did you ever discuss the
17   insurance issue with Mr. Rigos?
18        A.    I don't believe I have, no.
19        Q.    Did you ever send the insurance
20   information you got to Mr. Cuculich?
21        A.    I don't think so.  I don't
22   remember but I don't think so.
23        Q.    Did he ask you what insurance
24   you had?
25        A.    He did recently, yes.
```

```
                                            Page 69
 1                    R. DiSPIRITO
 2         Q.     What did you tell him?
 3         A.     I told him I had a policy
 4   started and I showed him the certificate of
 5   -- COI, and that's all I remember.
 6         Q.     Do you remember when that
 7   insurance started?
 8         A.     No.
 9         Q.     Going to page eight, Article 9,
10   Electricity, Gas, Water, Et Cetera, did
11   favor Flavorworks pay for utilities as
12   required by Article 9 of this lease?
13         A.     Not as required.  In other
14   words, we fell behind.
15         Q.     Do you know how far behind?
16         A.     In terms of months or amounts?
17         Q.     Do you have any estimate of the
18   amount?
19         A.     About $50,000.
20         Q.     Can you repeat that?
21         A.     About $50,000.
22         Q.     Did you say fifty?
23         A.     Yes.
24         Q.     Is that the current amount of
25   arrears?
```

                         R. DiSPIRITO

1

2        A.    I don't know if it's the

3   current amount.

4        Q.    Is that with the gas company or

5   electricity or what?

6        A.    That's electricity.

7        Q.    Any other utility arrears?

8        A.    Yes, water.  The water bill.

9        Q.    How far behind is that?

10       A.    I think it's a few thousand

11   dollars.  I think it's like five or six

12   thousand.

13       Q.    Any other utilities you are in

14   arrears on?

15       A.    No.

16       Q.    Did you ever discuss the

17   arrears on these utilities with Mr. Rigos?

18       A.    I don't believe so.

19       Q.    Did you ever discuss this

20   Article 9 with Mr. Rigos?

21       A.    I don't remember discussing it

22   with him, no.

23       Q.    Sorry, you don't recall

24   discussing it with him?

25       A.    I may have, I just don't

Page 71

```
 1                    R. DiSPIRITO
 2    recall.
 3              MR. BRADHAM:  I want to go next
 4         to what I'm going to mark as Exhibit
 5         5 and it's a series of E-mails and at
 6         the front it says, "exhibit
 7         Plaintiff's 3".  I'm going to mark as
 8         Exhibit 5 a document, the first page
 9         says, "exhibit Plaintiff's 3" and it
10         has a Bates stamp number Rigos 204
11         and it continues until Rigos 211.
12              (Whereupon, the aforementioned
13         document was marked as Plaintiff's
14         Exhibit 5 for identification as of
15         this date by the Reporter.)
16         Q.    Just looking at the first page
17    here, Mr. DiSpirito, it's a November 13,
18    2014 E-mail from you to John Rigos and it
19    says -- sorry, it's from John Rigos to you
20    and others and it says, "Rocco/William, the
21    guarantee and the indemnification look
22    good, please send me the versions for which
23    you would like my signature and I will turn
24    them right around".  Do you recall seeing
25    this E-mail?
```

```
                                        Page 72
 1                    R. DiSPIRITO
 2        A.    I generally recall it, yes.  I
 3   mean the recall, the period and the fact
 4   these E-mails went around.  The exact
 5   moment I saw this I don't recall.  But I
 6   believe I am familiar with this.
 7        Q.    He refers to the guarantee and
 8   the indemnification look good, is it your
 9   understanding that the guarantee he is
10   referring to is the guarantee in the lease
11   we already discussed?
12        A.    Is it my understanding that the
13   guarantee referred to in this E-mail is the
14   same as the guarantee in the lease?
15        Q.    Yes.
16        A.    I think so, yes.
17        Q.    He then refers to an
18   indemnification, do you know what he is
19   referring to?
20        A.    Yes, I do.
21        Q.    Can you tell me what that is?
22        A.    It's an indemnification I
23   provided to him for any costs associated
24   with the guarantee, to the best of my
25   recollection.
```

Page 73

```
 1                    R. DiSPIRITO
 2        Q.    Did Mr. Rigos request that you
 3   would indemnify him in consideration of the
 4   guarantee?
 5        A.    I don't remember how it
 6   transpired, but the indemnification came up
 7   during this process, I don't remember if it
 8   is lawyer to lawyer or Mr. Rigos to me, but
 9   it became part of the discussion and I
10   agreed to it.
11        Q.    Do you recall discussing the
12   indemnification with Mr. Rigos?
13        A.    Generally recall some
14   discussion, I don't have specifics in my
15   mind, but I generally recall, yes.
16        Q.    Is it your understanding that
17   Mr. Rigos was requesting an indemnification
18   in order for him to sign the guarantee?
19        A.    Yes, I think so.  I'm not sure
20   the order in which things transpired, but I
21   think it came before the guarantee.
22        Q.    Let's go to the second to last
23   page of those documents, so it would be
24   Rigos 210 and Rigos 211.
25        A.    Yes, here it is in the E-mail.
```

Page 74

1                    R. DiSPIRITO

2        Q.    What is your understanding of

3   this Rigos 210 to 211; is this a draft of

4   the indemnity?

5        A.    Is this part of the lease?  I

6   can't see who it is from.  I'm not sure.

7   It looks like language regarding an

8   indemnification as discussed between -- I

9   don't know who it's from.  It says here

10  with a copy to William Randolph who was my

11  attorney at the time.  I'm not sure if this

12  was generated by my attorney or his

13  attorney or him or me.  But it seems to be

14  clearly discussing indemnification that I

15  would provide.

16       Q.    Was it your understanding that

17  this document, Rigos 210 and 211, is a

18  draft of the indemnification agreement you

19  agreed to provide Mr. Rigos for being the

20  guarantor?

21       A.    I know I indemnified him in

22  writing.  I don't remember if this is the

23  draft.  I know I indemnified him in writing

24  and agreed to indemnified him of all

25  responsibility regarding the guarantee.

```
                                          Page 75

 1                    R. DiSPIRITO

 2        Q.    When you say you agreed to

 3   indemnify him, was there a final document

 4   that you signed that said --

 5        A.    Yes, yes, I think there was.

 6             MR. BAILEY:  Let him finish.

 7             THE WITNESS:  Sorry.

 8        Q.    Do you have a copy of that

 9   document?

10        A.    I'm sure I do somewhere.

11        Q.    You think you have a copy

12   somewhere?

13        A.    I think so, yes.

14        Q.    Is there anyone else, to your

15   knowledge, who would have a copy?

16        A.    If there was an E-mail to

17   Mr. Randolph then I imagine he would have a

18   copy.  Do you know where this E-mail

19   originated from?  Is this an E-mail?

20        Q.    If you look at the documents we

21   have here, so this is a series of E-mails,

22   and then this Rigos 210 and 211 is

23   attached, so the first I asked you about

24   says, you know, the guarantee and

25   indemnification look good.  If you want to
```

```
 1                  R. DiSPIRITO
 2  take time and look through the E-mails, if
 3  you go to Rigos 209, which comes right
 4  before 210 and 211.
 5       A.    Okay.  You are saying this was
 6  attached to that E-mail?
 7       Q.    Well, if you look at the
 8  E-mail, there's an E-mail from you, this is
 9  Rigos 209 from you.
10       A.    Right, okay, yes.
11       Q.    John Rigos dated November 11,
12  2014.
13       A.    Right.
14       Q.    Subject indemnification
15  agreement, and then it has DiSpirito
16  compared docs, so my question to you is, is
17  it your understanding that you were
18  forwarding this draft indemnification
19  agreement that's Rigos 210, 211 to
20  Mr. Rigos?
21       A.    It's hard to say.  I remember
22  that there was an indemnification.  I don't
23  know if this is the document that ended up
24  becoming that indemnification.  But it
25  looks familiar and I again know there was a
```

```
                                              Page 77
 1                 R. DiSPIRITO
 2   signed document, so...
 3        Q.    Let me just sort of rephrase
 4   it.  Is it your understanding that the
 5   document that is Rigos 210 and 211 was
 6   attached to your E-mail that's on page
 7   Rigos 209?
 8        A.    It's really hard for me to
 9   remember.  The way it's presented here, it
10   looks like it was attached.  But I can't
11   say for sure.  I will take your word for it
12   if you are saying this was in the E-mail, I
13   believe you.
14        Q.    It's not for you to take my
15   word.  I can only present to you the
16   documents and ask you your understanding.
17        A.    My understanding is this is
18   probably a draft of the indemnification.
19        Q.    And you believe that you have a
20   final signed copy of that indemnification
21   somewhere?
22        A.    Yes.
23        Q.    Where would you keep that?
24        A.    It's probably in an E-mail
25   somewhere.
```

```
 1                    R. DiSPIRITO
 2        Q.    Sorry?
 3        A.    It's probably in an E-mail
 4   somewhere, it's probably a PDF document.
 5        Q.    Has Mr. Rigos asked for a copy
 6   of this?
 7        A.    Has he asked me for a copy?
 8        Q.    Yes.
 9        A.    Recently, you mean?
10        Q.    At any time.
11        A.    I imagine at the time we signed
12   it there were copies circulated.  I don't
13   remember discussing it since then.
14        Q.    Do you remember since this
15   lawsuit -- well, do you remember in 2021 or
16   2022 sending him a copy of it?
17        A.    I don't remember that, no.
18        Q.    Has Mr. Rigos made any kind of
19   request to you since this lawsuit started
20   that you comply with that indemnity
21   agreement and indemnify him?
22        A.    I don't remember making any
23   specific request.
24        Q.    Have you discussed the
25   indemnity agreement with him since this
```

```
 1                    R. DiSPIRITO
 2    lawsuit started to since the last year or
 3    two?
 4         A.    I don't think so.  I don't
 5    remember discussing it with him.
 6         Q.    Have you discussed that
 7    indemnity agreement with anyone other than
 8    your attorneys?
 9         A.    I don't think so.
10         Q.    Is it your intention to
11    indemnify Mr. Rigos for any damages and
12    attorneys' fee that he incurs in this
13    lawsuit?
14              MR. BAILEY:  Objection to form.
15         You may answer.
16         A.    I'm not sure I understand the
17    ramifications of the question and answer.
18    I would rather not answer.  I don't know
19    without talking to my attorney what I
20    agreed to.  But I did sign an
21    indemnification agreement and I stand by
22    whatever was written in that agreement.
23         Q.    So you plan to honor that
24    agreement?
25         A.    Yes, I am.
```

```
 1                    R. DiSPIRITO
 2       Q.    I'm aware that Flavorworks
 3  Trucks is in bankruptcy, but have any other
 4  entities that you have been an owner or
 5  membership of ever been in bankruptcy?
 6       A.    Since -- no, not before
 7  Flavorworks Trucks that I know of, and
 8  since then one other entity.
 9       Q.    What entity is that?
10       A.    Flavorworks, Inc.
11       Q.    Have you ever filed a personal
12  bankruptcy?
13       A.    No.
14       Q.    So I think that's about it for
15  me.  I would like to just take about two
16  minutes and look over my notes and see if I
17  have any other questions.  So if we could
18  go off the record for just two minutes and
19  I will resume shortly.
20            (Whereupon, an off-the-record
21        discussion was held.)
22       Q.    One last question.  Have you
23  had any discussions with Mr. Rigos in the
24  last few months about your operations?
25       A.    About the operations per se, I
```

```
 1                     R. DiSPIRITO
 2  don't think so, no.
 3       Q.    Then I believe you said you're
 4  still operating?
 5       A.    Yes.
 6       Q.    And you have one employee?
 7       A.    Yes.
 8       Q.    And you intend to continue
 9  operating?
10       A.    Yes.
11       Q.    Is that something you have
12  discussed with Mr. Rigos?
13       A.    I don't think so.
14       Q.    Have you had any recent
15  discussions with Mr. Rigos about him
16  participating in your business?
17       A.    Not per se, no.
18       Q.    Sorry?
19       A.    Not per se.
20       Q.    When you say, "not per se",
21  what does that mean?
22       A.    I mean --
23            MR. BAILEY:  That's a different
24       restaurant.
25       A.    Yes.  I have had discussions
```

```
 1                    R. DiSPIRITO
 2   with him but I don't believe we discussed
 3   these operations.
 4        Q.    So you have had recent
 5   discussions with Mr. Rigos about other
 6   business ventures?
 7        A.    Other business -- I guess we
 8   had a discussion about -- actually, I don't
 9   think we did, no, I don't think we had a
10   recent discussion about other business
11   interests.
12        Q.    Do you have any current plans
13   to go into business with Mr. Rigos?
14        A.    Current plans as I sit here
15   now?
16        Q.    Have you discussed any plans to
17   go into business with Mr. Rigos within the
18   last six months?
19        A.    No, I haven't.
20        Q.    Would you consider your
21   relationship with Mr. Rigos to still be a
22   good relationship?
23        A.    It would be me impossible for
24   me to characterize our relationship from
25   this side of the street.
```

Page 83

1                    R. DiSPIRITO

2        Q.     Well, can you give me any

3   opinion as to where you think you and

4   Mr. Rigos stand now?

5        A.     We're cordial, polite and

6   respectful.

7              (Whereupon, at 1:00 p.m. the

8         Examination of this witness was

9         concluded.)

10

11            º            º            º            º

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 84

```
 1              R. DiSPIRITO
 2          D E C L A R A T I O N
 3

 4       I hereby certify that having been
 5   first duly sworn to testify to the truth, I
 6   gave the above testimony.

 7

 8       I FURTHER CERTIFY that the foregoing
 9   transcript is a true and correct transcript
10   of the testimony given by me at the time
11   and place specified hereinbefore.
12

13

14

              _____
15                 ROCCO DiSPIRITO
16

17

18   Subscribed and sworn to before me
19   this _____ day of _____ 20___.
20

21

     _____
22       NOTARY PUBLIC
23

24

25
```

Page 85

1                          R. DiSPIRITO

2                      E X H I B I T S

3

4    PLAINTIFF EXHIBITS

5

6    EXHIBIT          EXHIBIT                           PAGE

7    NUMBER            DESCRIPTION

8     Exhibit 1    Subpoena to Testify At

9                  a Deposition in a Civil

10                 Action Rocco DiSpirito        17

11    Exhibit 2    Subpoena to Produce

12                 Documents Directed to

13                 Flavorworks Trucks LLC        17

14    Exhibit 3    Agreement of Lease            18

15    Exhibit 4    Declaration of

16                 John Z. Rigos                 50

17    Exhibit 5    Exhibit 3 (Bates stamp

18                 Rigos 204 - 211)              71

19

20        (Exhibits retained by Counsel.)

21

22

23

24

25

Page 86

1                    R. DiSPIRITO

2                    I N D E X

3

4   EXAMINATION BY                        PAGE

5   Mr.  Bradham                           4

6

7

8     INFORMATION AND/OR DOCUMENTS REQUESTED

9   INFORMATION AND/OR DOCUMENTS          PAGE

10  (None)

11

12

13       QUESTIONS MARKED FOR RULINGS

14  PAGE LINE QUESTION

15  (None)

16

17

18

19

20

21

22

23

24

25

Page 87

```
 1                    R. DiSPIRITO
 2              C E R T I F I C A T E
 3
 4   STATE OF NEW YORK        )
                              :  SS.:
 5   COUNTY OF NASSAU         )
 6
 7         I, FRANCINE DELFINO, a Notary Public
 8   for and within the State of New York, do
 9   hereby certify:
10         That the witness whose examination is
11   hereinbefore set forth was duly sworn and
12   that such examination is a true record of
13   the testimony given by that witness.
14         I further certify that I am not
15   related to any of the parties to this
16   action by blood or by marriage and that I
17   am in no way interested in the outcome of
18   this matter.
19         IN WITNESS WHEREOF, I have hereunto
20   set my hand this 20th day of December 2022.
21
22
23
                    FRANCINE DELFINO
24
25
```

Page 88

**ERRATA SHEET**
**VERITEXT/NEW YORK REPORTING, LLC**

CASE NAME: Cuculich, Steven A., Et Al. v. Rigos, John Z.
DATE OF DEPOSITION: 12/19/2022
WITNESSES' NAME: Rocco Dispirito

PAGE    LINE (S)        CHANGE              REASON
____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

                                  _____
                                  Rocco Dispirito
SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.


_____        _____
(NOTARY PUBLIC)               MY COMMISSION EXPIRES:

**[& - alliance]**                                                    Page 1

| & | | | |
|---|---|---|---|
| **&**  2:4,8 3:17 | **2022**  1:10 14:3 78:16 87:20 | **5** | 85:10 87:16 |

**&**

**&**  2:4,8 3:17

**1**

**1**  3:17 17:17,23 18:9 85:8
**10011**  4:13
**10022**  2:6
**10165**  2:10
**11**  76:11
**11791**  2:14
**11:00**  1:11
**12/19/2022** 88:3
**13**  71:17
**17**  85:10,13
**18**  85:14
**19**  1:10
**1:00**  83:7
**1:21**  1:6

**2**

**2**  17:20,23 85:11
**20**  41:14 84:19 88:22
**2002**  8:2 9:25
**2014**  71:18 76:12
**2015**  46:2,15
**2016**  46:15
**2017**  46:15
**2020**  40:19 42:4 51:14
**2021**  78:15

**2022**  1:10 14:3 78:16 87:20
**204**  71:10 85:18
**209**  76:3,9 77:7
**20th**  87:20
**210**  73:24 74:3 74:17 75:22 76:4,19 77:5
**211**  71:11 73:24 74:3,17 75:22 76:4,19 77:5 85:18
**2450**  2:9
**24686**  87:22
**28**  16:9

**3**

**3**  18:13,16 33:12 51:11 62:3 63:5 71:7 71:9 85:14,17
**30**  3:16 41:14
**308**  2:13
**3434**  2:13
**367**  4:13 63:12

**4**

**4**  50:18,21 85:15 86:5
**444**  2:5
**45-13**  33:21 37:18,25 38:9
**485**  2:13
**4th**  2:5

**5**

**5**  71:5,8,14 85:17
**50**  85:16
**50,000**  69:19,21
**511**  4:12 63:11

**6**

**6**  66:15,24
**6752**  1:6

**7**

**71**  85:18

**9**

**9**  69:9,12 70:20

**a**

**a.m.**  1:11
**ability**  24:22
**able**  23:23 24:6 43:10
**accountant** 65:2,4 66:5,9
**accountants** 48:2
**accuracy**  12:23 20:22 21:7 30:8 44:23 57:25
**accurate**  49:9 51:22 52:3
**ackerman** 14:10 16:18 25:10
**action**  13:14 17:16 60:15

85:10 87:16
**addition**  50:6
**additional**  68:2
**address**  4:11 5:18 63:11,15
**administer** 3:11
**administration** 6:25 7:9
**adversely**  58:8
**advice**  16:14 48:22 59:16
**advise**  30:17
**advisor**  31:23
**aforemention...** 17:21 18:14 50:19 71:12
**ago**  7:2 67:21
**agree**  21:15 67:10,13,22
**agreed**  3:5,20 20:18 21:17,19 22:4 42:5 73:10 74:19,24 75:2 79:20
**agreement**  18:3 18:8 26:7,10 63:5 74:18 76:15,19 78:21 78:25 79:7,21 79:22,24 85:14
**ahead**  6:4,18
**al**  88:2
**alliance**  60:8

americas 4:12
63:12
amorphous
55:19
amount 64:5
65:22 69:18,24
70:3
amounts 69:16
andrew 56:12
57:3
annexed 18:4
answer 5:9
14:20 16:5,11
20:3 50:4
53:21,25 54:3
54:22 55:7,9
55:25 57:22,25
79:15,17,18
answered
14:20 57:22
58:24
appear 11:14
16:9
appropriate
67:4,19,23
approximate
64:8,12,18
approximately
62:25
april 40:18
arbitration
10:12,17,19,24
11:4
areas 5:11

argumentative
53:20
arrangement
27:5,6,8
arrears 23:23
25:24 26:4,6
26:13 27:5,9
29:20 30:12,14
69:25 70:7,14
70:17
article 66:15,24
67:3,5 69:9,12
70:20
asked 10:4
14:19 15:17
20:5,6,7,7,17
23:22 27:10
53:22 57:21
58:23 75:23
78:5,7
asking 53:2
54:7 55:2,3
62:6 64:15
associated
72:23
assurances
24:13,16
astoria 33:21
37:19 38:2
attached 75:23
76:6 77:6,10
attending
11:20,23
attorney 11:17
12:4 14:8,9

15:17,19,22
74:11,12,13
79:19
attorneys 2:5,9
2:13 4:21
11:18,19,22,24
14:6,7,12
15:10,14 16:14
16:17 27:10,14
59:4,15,22
61:20 64:22,25
79:8,12
authorized
3:11
automatic 5:12
avenue 2:5 4:12
63:11
aware 4:19
47:4,10,14,15
80:2

**b**

b 85:2
back 4:19 6:16
20:23 41:3
58:5 59:4 62:3
63:4
bailey 2:12,14
4:14 11:18
13:17 14:19
15:6 16:4,10
16:24 18:4
20:2 50:16
52:23 53:14,18
54:2,10,21
55:6,9 57:21

58:23 62:5
75:6 79:14
81:23
bankruptcy
4:20,24 5:20
5:24 6:3 12:25
80:3,5,12
barely 59:7
based 60:15
65:19 68:14,15
basically 39:10
basis 57:6,7
60:12,14
bates 71:10
85:17
becoming
76:24
began 47:22
beginning 5:19
41:12 46:14
belief 57:6 58:2
believe 5:25
10:2,17 11:3
13:20 14:2
22:19 26:3
27:11 34:6
35:24 45:2
46:22 57:4,5
58:13,16,17,20
59:2,14,16,17
59:20,25 60:16
67:20 68:4,7
68:18 70:18
72:6 77:13,19
81:3 82:2

**best** 21:8 72:24
**beverage** 51:16
  56:8 62:21
**beyond** 12:19
  15:21 37:16
**big** 30:20 65:12
**bill** 70:8
**bit** 11:8
**blasted** 60:20
**blood** 87:16
**blvd** 2:13
**bradham** 2:4,6
  4:7 5:4,17 6:6
  13:15 16:20
  17:13 18:12
  50:9 53:22
  54:6 62:8,11
  71:3 86:5
**break** 6:17 62:6
  62:9,12
**briefly** 5:17
**bring** 6:16 8:25
  67:16
**brings** 8:23
**broadway**
  33:21 37:18,25
  38:9
**broker** 29:16
  29:18 67:17
  68:10
**brooklyn** 65:20
**brought** 9:19
**brown** 2:4
**business** 11:13
  19:14,17,19,23

30:16,18 32:9
32:18 33:7,10
33:15,16,17
34:3,3,4,9,14
34:14,22 35:4
35:12,16,17
36:17,20,21
37:14 38:5
41:11 42:22
45:17 46:4
47:24 48:9,13
48:18 49:19,23
52:4 58:8
63:11,17 64:24
81:16 82:6,7
82:10,13,17
**businesses**
  19:21 32:25
  36:23 51:24
  63:19

**c**

**c** 2:2 4:2,2 84:2
  87:2,2
**call** 37:2
**called** 4:2 10:12
  32:23 33:5
  50:13 65:13
**capacity** 15:16
**caption** 7:4,7
**case** 1:5 4:23
  5:25 7:2,5,8,11
  7:13 8:3 9:17
  9:18,19,25
  10:15,20,21,24
  11:2 35:10

88:2
**cases** 9:15,23
**casual** 44:4
**catch** 28:18,23
  30:14
**catching** 28:15
**caught** 29:2
**caused** 43:24
**caution** 15:6
**cease** 38:20
  39:15 40:6
  41:19 42:3,14
  42:21 43:5,16
  43:24 57:17,18
  57:19 58:22
  59:12
**ceased** 39:11
  45:3 51:15
  61:17
**ceasing** 41:21
  61:24
**celebrity** 23:3
**central** 2:9
**certainly** 5:8
**certainty** 56:17
**certificate** 69:4
**certification**
  3:8
**certify** 84:4,8
  87:9,14
**cetera** 69:10
**change** 88:5
**changed** 22:12
  22:15,19

**chapter** 4:22
**characterize**
  82:24
**chef** 11:7,9
  53:13,24 54:8
  54:13 55:15
**chodorow** 9:11
  9:12,19 10:21
**chronological**
  34:8
**circulated**
  78:12
**city** 9:6 37:16
  42:7 60:4
**civil** 13:14
  17:16 85:9
**clarify** 47:11
**clear** 5:21
  15:13 32:20
  35:14 42:18
  52:5 55:14,23
**clearly** 6:10
  74:14
**clients** 37:22
  39:7 40:11,22
**close** 58:6
**closer** 41:13
  46:14
**coi** 69:5
**come** 14:4
  19:24 26:6,10
  63:22
**comes** 76:3
**coming** 31:16
  41:3 43:13

**comment** 53:6 54:25
**commission** 88:25
**commitment** 67:4
**communicati...** 28:12 30:11 47:16 66:2
**companies** 42:21 44:11,13 44:18
**company** 42:14 44:18,20 70:4
**compared** 76:16
**complied** 66:24
**comply** 51:16 58:14,19 78:20
**complying** 58:12,13
**concern** 7:8 19:20
**concerned** 19:22
**concluded** 83:9
**conditions** 40:9
**conducted** 34:22
**confused** 57:23 59:5
**confusing** 42:24 57:9
**consequences** 5:14

**consider** 21:13 82:20
**consideration** 73:3
**consistent** 18:25
**constitutes** 51:25
**consult** 11:14
**consume** 57:15
**consumer** 31:13
**consumers** 31:15
**contents** 15:8
**continue** 81:8
**continued** 21:16
**continues** 71:11
**contractors** 48:5
**conversation** 21:20 23:7 29:14,18 30:2 44:5 49:3
**conversations** 21:21
**cookbooks** 11:13
**copies** 78:12
**copy** 3:14,17 74:10 75:8,11 75:15,18 77:20 78:5,7,16

**cordial** 83:5
**correct** 11:25 17:12 18:20,23 19:11 31:16,17 31:17 33:13,23 34:16,24 35:18 36:6 38:2,3 39:13 40:2 42:10 43:6 45:5 52:17,22 54:16 62:18,22 84:9
**correctly** 21:18
**cost** 44:22
**costs** 72:23
**counsel** 3:6,17 4:17,19,25 6:3 85:20
**counterclaim** 8:25
**countersuit** 8:16,19
**county** 87:5
**couple** 66:6,8
**course** 28:25 43:21 46:2
**courses** 60:15
**court** 1:2 3:13 6:15 7:3 9:7,22 10:2,9,25 11:2
**courtroom** 10:6 10:14
**covid** 38:24 39:2

**creating** 33:7,8
**cuculich** 1:3,4 13:8 27:23 28:2,7 29:10 29:15 30:10 31:19 47:5,6 47:13,19 49:2 67:7,10 68:20 88:2
**cuomo** 51:18 56:12 57:3
**current** 69:24 70:3 82:12,14
**currently** 11:5 64:6
**custom** 33:8
**customers** 38:18 41:8,10 57:14
**cv** 1:6

**d**

**d** 3:2 4:2 84:2 86:2
**daily** 60:12,13
**damages** 79:11
**date** 1:10 17:24 18:17 26:22 50:22 71:15 88:3
**dated** 76:11
**day** 57:24 84:19 87:20 88:22
**days** 3:16 39:6 43:16,24 45:4

52:9
**december** 1:10
87:20
**decided** 4:24
**declaration**
50:10,13,17
85:15
**deemed** 17:22
50:20
**defendant** 1:8
2:9,17 8:13,22
8:24 9:2
**defendants**
8:25
**definitely** 25:12
**definition** 53:5
53:16 54:24
55:3,13
**definitions**
55:20 57:10
**degree** 12:22
**delegating**
25:17 27:13
**delfino** 1:17
87:7,23
**delicious** 36:22
**deliver** 34:24
39:9
**delivered** 37:21
**deliveries**
40:11,13,22
**delivering** 33:9
34:9,15 38:18
**delivery** 11:13
37:15 38:5

42:14,21
**deposed** 6:21
7:15,20,24
9:14
**deposition** 3:8
3:9,14 4:25 6:7
9:24 11:16
13:13 16:9
17:15 18:10
85:9 88:3
**description**
85:7
**determine**
60:14
**dictated** 47:24
**different** 9:23
15:14,15 17:3
31:14 32:24
44:18,19 45:24
55:22 81:23
**difficult** 40:13
**direct** 5:8 31:13
**directed** 17:19
85:12
**directing** 53:20
53:24 54:3
**directly** 57:12
**discontent** 31:6
**discuss** 12:10
23:20 24:3,21
25:24 49:15
51:24 59:4
61:8,16 65:21
68:16 70:16,19

**discussed** 5:3
11:15 12:3,7
12:12,16,23
13:7 15:19
19:18,20 23:25
24:19 25:23
26:3 29:21,22
30:7 36:24
37:7 48:21
49:17 50:5
61:13 62:16
72:11 74:8
78:24 79:6
81:12 82:2,16
**discussing**
19:23 31:11
32:9,10,12,14
32:16,16,21
33:15 34:2,5,8
51:7 70:21,24
73:11 74:14
78:13 79:5
**discussion**
20:17,19,24,25
21:16 27:21
49:25 50:4
73:9,14 80:21
82:8,10
**discussions**
12:21 13:4
15:9,21 21:2,5
21:9 23:10,14
23:15,17 25:10
27:22 28:2,6
31:20 34:6,12

35:3,8,11,15,21
35:25 36:7
48:19 49:21
61:19,22,24
67:7,15,18
80:23 81:15,25
82:5
**dispirito** 1:15
4:1,10 5:1,20
6:1,5 7:1 8:1
9:1 10:1 11:1
12:1 13:1,14
14:1 15:1 16:1
16:25 17:1,16
18:1,3 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1,22
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1,10
50:12,24 51:1
52:1 53:1 54:1
54:13 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1,15 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1,17

72:1 73:1 74:1
75:1 76:1,15
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1,15
85:1,10 86:1
87:1 88:3,21
**dispirito's** 6:2
**district** 1:2,2
5:21
**docs** 76:16
**document**
18:15 50:13,20
50:25 71:8,13
74:17 75:3,9
76:23 77:2,5
78:4
**documents**
17:19,22 73:23
75:20 77:16
85:12 86:8,9
**doing** 36:21
48:15
**dollars** 70:11
**donna** 65:5,13
65:13,16,17
66:4,10
**doors** 31:12
**doubt** 20:22
**dozen** 28:10
**draft** 51:5,8
74:3,18,23
76:18 77:18
**drinking** 51:13
51:20,25 52:20

53:4,9 54:19
55:4,16,18,25
56:5
**duces** 16:23
**due** 38:23,25
**duly** 4:3 84:5
87:11

**e**

**e** 2:2,2 3:2,2
14:6,22 60:12
60:17,19,25
61:6,9,12 71:5
71:18,25 72:4
72:13 73:25
75:16,18,19,21
76:2,6,8,8 77:6
77:12,24 78:3
84:2 85:2 86:2
87:2,2
**earlier** 10:16
48:21 67:6
**earnest** 58:4
**eating** 51:13,21
51:25 52:21
53:3,9 54:19
55:4,17,19
56:2,5
**ed** 13:15 16:20
18:2 50:9
**edward** 2:14
**effect** 3:12,15
**effort** 26:19
**eight** 69:9
**either** 8:22
40:24

**electricity**
69:10 70:5,6
**eleven** 4:22
**emergency**
51:17 56:10,14
56:21 57:2
58:12,14,18,21
59:13
**employee** 45:23
81:6
**employees**
40:14 45:19,25
46:10,16,19,24
47:2,12,17,22
**enacted** 60:24
**ended** 10:16
33:17 36:5
76:23
**entered** 36:2
**entire** 7:16
**entities** 6:2
14:14 80:4
**entity** 5:23
14:18 33:4
80:8,9
**errata** 88:1
**esq** 2:6,10,14
**esqs** 2:8
**establish** 52:2
**establishment**
51:13,21 52:21
53:4,9 54:20
55:5,17,19
56:2

**estate** 6:25 7:10
7:11 9:18
**estimate** 69:17
**et** 69:10 88:2
**exact** 33:16
35:6,21 64:7
64:17 72:4
**exactly** 30:25
40:17
**examination**
1:14 4:6 5:3
83:8 86:4
87:10,12
**examined** 4:5
**executing**
33:18
**executive** 51:17
56:11,22 57:2
57:8,16,20,24
58:12,15,18,21
59:13
**exhibit** 17:17
17:20 18:9,13
18:16 33:12
50:18,21 62:3
63:5 71:4,6,8,9
71:14 85:6,6,8
85:11,14,15,17
85:17
**exhibits** 17:23
85:4,20
**existence** 7:19
**expert** 43:2
**expires** 88:25

explain 6:13 11:8 19:15 22:7
express 24:9
extent 24:15

**f**

f 3:2 39:23,23 87:2
fact 24:4 31:6 72:3
fairly 30:21
familiar 23:5 72:6 76:25
family 1:4 31:22
far 16:15 69:15 70:9
favor 69:11
fbo 1:4
federal 9:7
fee 79:12
feel 13:23
fell 69:14
felt 25:14
fifteen 41:9,17
fifty 69:22
filed 9:5 10:24 11:2 80:11
filing 3:7 4:21
final 75:3 77:20
financial 23:4
finish 75:6
firm 16:18 25:9 65:6,8,10,12,17

first 4:3 9:4 17:14 35:22 41:13 51:19 63:9,10 71:8 71:16 75:23 84:5
five 12:18 23:15 62:12 70:11
fix 44:12
flavorworks 4:23 14:18 16:22 17:19 18:20 26:5 32:22 33:3 36:21 37:3,8 37:11,13 38:14 45:7 47:25 48:8 51:12,15 51:20 64:2 66:16 69:11 80:2,7,10 85:13
floor 2:5
focused 30:3
following 62:15
follows 4:5
food 11:13 40:13 42:14,21 51:15,24 52:4 56:8 62:21
force 3:15
foregoing 84:8
form 3:21 16:4 16:10 20:3

52:23 53:14 79:14
former 14:9,11 51:17 56:11
forth 4:20 87:11
forum 59:19 60:2
forward 5:2 30:6
forwarded 61:11
forwarding 76:18
four 39:20 46:22,24 47:21 66:14
francine 1:17 87:7,23
frequently 31:24 48:22
friedman 2:4
friendly 19:16
friends 19:5,7,9 19:14
front 50:14 63:7 71:6
further 3:20 84:8 87:14

**g**

gas 69:10 70:4
general 12:12 28:14 29:19,20 29:23,23 31:6 42:3 56:4 58:2

60:22
generally 22:10 23:23 24:11,22 25:6,14 26:3 26:18,21 32:10 33:6 49:16 52:4 56:13 60:19 72:2 73:13,15
generated 74:12
gerard 2:10
getting 30:4
give 21:8 24:13 83:2
given 84:10 87:13
go 5:2 6:4,18 18:18 27:20 39:7 59:4 62:3 63:4 66:14 71:3 73:22 76:3 80:18 82:13,17
going 5:5,8 25:2 26:15,25 28:18 37:2 41:25 42:25 49:17,19 50:16 54:4 55:7 69:9 71:4,7
good 71:22 72:8 75:25 82:22

| government | handling 16:15 | **i** | individually |
|---|---|---|---|
| 38:8,10,12 | happen 61:20 | | 4:18 14:13,17 |
| 41:20 42:13,20 | happened | ideas 19:23 | information |
| governor 51:18 | 21:14 35:9 | identification | 12:13 68:20 |
| 56:11 57:3 | 59:6,7 | 17:24 18:16 | 86:8,9 |
| grand 2:9 | happy 6:13 | 50:22 71:14 | initially 8:21 |
| guarantee 22:4 | 64:10 | ii 1:4 | innovation |
| 22:21 23:11 | hard 76:21 | imagine 25:4 | 49:18 |
| 35:12 71:21 | 77:8 | 28:3 75:17 | insult 54:4 |
| 72:7,9,10,13,14 | healthy 33:7,8 | 78:11 | insulting 54:2,6 |
| 72:24 73:4,18 | 34:9,15,23 | important 6:9 | insurance |
| 73:21 74:25 | 37:14 | impossible | 29:16,18 30:4 |
| 75:24 | hear 6:11,11,14 | 82:23 | 66:15,16,20,25 |
| guaranteed | hearing 10:2,3 | improve 30:18 | 67:3,8,11,13,17 |
| 32:8 33:25 | held 1:16 80:21 | incredibly 57:8 | 67:17,20,23 |
| 35:2 | help 31:23 | incurs 79:12 | 68:3,8,17,19,23 |
| guarantor | helpful 22:6,8 | indemnificati... | 69:7 |
| 18:23 19:10,25 | 22:10 | 71:21 72:8,18 | intend 81:8 |
| 20:8,11 21:12 | hereinbefore | 72:22 73:6,12 | intention 79:10 |
| 21:13,23 22:13 | 84:11 87:11 | 73:17 74:8,14 | inter 1:3 |
| 22:15,19 74:20 | hereunto 87:19 | 74:18 75:25 | interested |
| guess 45:8 52:3 | hire 45:23 | 76:14,18,22,24 | 87:17 |
| 56:15 63:21 | hired 44:11 | 77:18,20 79:21 | interests 82:11 |
| 64:11,22 65:11 | 59:23 | indemnified | interpreted |
| 82:7 | home 33:9 | 74:21,23,24 | 55:21 |
| guessing 32:5 | honest 52:9 | indemnify 73:3 | intersects |
| 55:12 | honestly 16:6 | 75:3 78:21 | 12:25 |
| guidance 59:11 | 16:13 53:10 | 79:11 | invest 36:14 |
| 60:2,9,10,11 | honor 79:23 | indemnity 74:4 | investing 49:22 |
| guy 22:5 | hoped 25:12 | 78:20,25 79:7 | involved 5:24 |
| **h** | hopes 27:6 | independent | 32:17,22 33:2 |
| | hospitality | 48:5 | 34:2,9,13 35:4 |
| h 85:2 | 59:18 60:7 | individual | 35:16 36:24 |
| hand 16:21 | hundred 49:9 | 15:16 17:6 | 37:8 49:22 |
| 87:20 | 56:16 | 65:16 | |

**involvement**
8:9 19:20 24:5
24:10
**issue** 5:7 7:25
68:17
**issued** 51:17
56:11,14,24
57:3,8,13,16
**issues** 12:24
**iteration** 33:14

**j**

**jeffery** 9:11
**jeffrey** 9:12,19
**jersey** 68:15
**john** 1:7 2:6,17
4:14 6:6 12:8
18:22 50:11,13
50:17 53:15,20
62:7 71:18,19
76:11 85:16
88:2
**judge** 3:13
**july** 15:2 16:9
40:19
**june** 40:19

**k**

**keep** 48:8 77:23
**kept** 48:11
**kind** 27:7 31:10
41:20 47:3,12
78:18
**kinds** 43:12
**knew** 16:15,16

**know** 6:17 8:19
12:17,23 15:18
15:23 16:7
19:4 23:6
26:22 27:4
31:11 35:14
40:18,23 41:3
41:6 43:25
51:24 52:6,16
52:18 53:3,4
53:10 54:19,23
55:13 56:10,15
56:18,19,21,23
57:9 60:21
64:5,12,14,16
64:21,25 65:12
68:4 69:15
70:2 72:18
74:9,21,23
75:18,24 76:23
76:25 79:18
80:7
**knowledge**
75:15

**l**

**l** 3:2,2 84:2
**laid** 57:10
**landlord** 21:11
24:7,24 25:8
25:11,20 26:7
26:11,17,23
27:2,22 44:3,5
44:7
**landlords**
27:18

**language** 74:7
**larger** 27:6
**largest** 46:9
**law** 2:12 5:22
5:25
**laws** 42:2,24
43:2 60:23
**lawsuit** 8:3,4,6
8:9,23 9:5 12:3
12:7,13,14,16
13:7 23:19,21
24:2,3,5,5,10
24:14 25:9,21
29:20,23 78:15
78:19 79:2,13
**lawsuits** 9:20
30:6
**lawyer** 73:8,8
**lawyers** 25:17
31:21
**leak** 39:5 43:4
43:5,17
**leaked** 43:9
**leaks** 43:12
44:3,6,9 45:3
**lease** 18:3,8,23
19:10,25 21:11
22:4,13,14,18
22:22 28:25
30:12 32:8
33:12,20,25
34:19,21 35:3
35:13 36:2
37:5 43:21
46:15 62:4

63:6 64:3
66:15,22 67:24
69:12 72:10,14
74:5 85:14
**left** 25:11
**legal** 7:13 30:5
53:5 54:23
55:2,12 57:13
59:11
**legitimate** 54:9
**life** 7:16 36:22
49:19,20
**line** 59:19
86:14 88:5
**litigation** 10:13
**live** 37:15
**lives** 49:17
**living** 11:6
**llc** 4:23 16:23
17:20 18:20
36:21 45:10,13
85:13 88:1
**llp** 2:4
**long** 39:15 66:4
**longer** 35:7,10
**look** 58:5 63:9
64:10,14 71:21
72:8 75:20,25
76:2,7 80:16
**looking** 18:7
21:11 71:16
**looks** 74:7
76:25 77:10
**lose** 46:16

**lot** 15:14 30:16
  36:8 49:3
  51:23 59:20

**m**

**madison** 2:5
**mail** 14:6 71:18
  71:25 72:13
  73:25 75:16,18
  75:19 76:6,8,8
  77:6,12,24
  78:3
**mailed** 14:22
**mails** 60:12,17
  60:19,25 61:6
  61:9,12 71:5
  72:4 75:21
  76:2
**making** 28:15
  78:22
**manager** 45:8,9
  45:11
**mandate** 41:20
  41:23,24 42:3
  42:20
**mandates** 43:3
**manhattan**
  68:14
**manner** 43:9
**march** 40:18
  51:14
**mark** 17:14
  18:12 50:16
  71:4,7
**marked** 17:22
  18:9,15 50:20

63:5 71:13
  86:13
**market** 45:23
**marriage** 87:16
**materialize**
  36:11
**matter** 87:18
**matters** 6:21,23
  23:21 24:2,2
**meal** 37:14
  38:4
**meals** 33:7,8
  34:10,15,23
  37:17 38:18
  39:9
**mean** 7:17
  20:20 23:5
  40:24 41:21
  52:6,24 55:21
  60:21 72:3
  78:9 81:21,22
**meaning** 23:10
  55:23 56:3
**meanings**
  55:20
**means** 52:2
  53:11
**meant** 16:13
  31:11 52:3
  56:18,20
**member** 59:18
**members** 45:12
  56:4 60:20
**membership**
  80:5

**mentioned** 9:18
  31:21,22 39:11
  40:15 43:4
  44:4,5 67:6
**met** 19:8
**mind** 73:15
**minute** 62:12
**minutes** 80:16
  80:18
**model** 31:4
**moment** 13:6
  72:5
**money** 11:9
**month** 13:25
  14:25
**months** 39:17
  39:19,20,21,22
  39:24,25 40:15
  40:16 42:4
  59:9 66:6,8
  67:21 69:16
  80:24 82:18
**morea** 2:4
**morici** 2:8,8,10
**morning** 6:7
**mother's** 7:10
**moving** 30:6
**multiple** 20:25
  21:3
**mutual** 19:5,7
  19:9

**n**

**n** 2:2 3:2 84:2
  86:2

**name** 4:8 6:6
  8:5 9:9 32:24
  44:15 60:5
  65:3,9,11,14,15
  65:15,16 88:2
  88:3
**names** 44:16,17
  48:6 66:12
  68:12
**nassau** 87:5
**nature** 8:8
  19:12 22:11
**need** 6:16 58:6
**needed** 20:11
  38:23 58:18
**never** 31:8,15
  36:17 37:24
  62:16,20
**new** 1:2,18 2:6
  2:6,10,10,14
  4:4,13,13 5:22
  9:6 19:23 33:4
  33:22 37:15
  42:7 59:17
  60:4,7,23
  61:14 65:20
  67:17 68:15
  87:4,8 88:1
**newer** 33:14
**nice** 22:5,5
  53:15
**nonparty** 1:15
  2:13
**notary** 1:18 4:4
  84:22 87:7

88:25
**note** 30:20
**notes** 80:16
**november**
  71:17 76:11
**number** 46:9
  56:14 63:12
  64:7,9,12,13,17
  64:19 71:10
  85:7
**numerous** 61:2

**o**

**o** 3:2 4:2,2,2
  39:23,23 84:2
**oath** 3:12
**object** 5:5 20:2
**objecting** 5:15
**objection** 16:4
  16:10 52:23
  53:14 54:21
  55:6 79:14
**objections** 3:21
**obtain** 66:16,19
**obvious** 41:5
**occasionally**
  31:24
**occur** 37:9
**occurs** 10:13
**offer** 48:22
**office** 63:13,15
  63:16
**officers** 45:15
**offices** 63:23
**oh** 47:9

**okay** 7:11 17:8
  18:6,11 21:10
  26:23,25 62:11
  63:8 76:5,10
**once** 15:5
**ones** 28:4 56:15
**open** 31:11
  42:17,17 58:6
**operate** 39:6
  40:9 43:10
  57:11 62:17
**operated** 35:17
  36:20 37:24
  41:11 46:3
**operates** 51:12
  51:20
**operating**
  33:11 38:15
  42:9 45:18
  48:18,20 81:4
  81:9
**operation**
  43:24 45:3
**operations** 38:8
  38:21,23 39:3
  39:12,16 40:6
  40:21 41:19,22
  42:15 43:5,17
  56:25 57:17,19
  57:20 58:22
  59:12 61:17,25
  80:24,25 82:3
**opinion** 24:9
  30:15 83:3

**order** 34:8 35:6
  35:9 56:22
  57:3,13,20
  73:18,20
**orders** 51:17
  56:11,14 57:8
  57:16,24 58:2
  58:13,15,18,21
  59:13
**organization**
  59:18 60:3,6
**original** 3:9,17
  49:24 50:3
**originated**
  75:19
**outcome** 87:17
**outside** 10:13
  43:13
**overall** 32:25
**overdue** 64:6
  65:22
**owner** 80:4

**p**

**p** 2:2,2 3:2 4:2
**p.c.** 2:12
**p.m.** 83:7
**page** 18:19
  63:10 66:14
  69:9 71:8,16
  73:23 77:6
  85:6 86:4,9,14
  88:5
**paid** 64:2
**pandemic** 29:6
  29:7,8 39:12

40:4,7,10,12,21
  41:7,16 42:15
  46:17,21,23
  47:22 58:7
  60:23 61:15
**panic** 59:8
**paragraph**
  51:11 63:10
**part** 13:8 26:16
  35:7,10,11
  73:9 74:5
**participating**
  81:16
**parties** 3:7
  87:15
**partners** 19:14
**partnership**
  7:25
**parts** 20:21
**party** 8:10 9:10
  9:20 10:11
**pay** 23:23
  25:24 26:4,6
  26:13,16 27:5
  27:8 69:11
**payment** 30:15
**payments**
  28:15,15,18,19
  28:24 29:2
**pdf** 78:4
**people** 31:12
  33:9 34:10,15
  34:24 36:9
  37:15 45:22
  51:23 55:21

57:13 61:2
64:24
**percent** 49:9
56:17
**perfectly** 54:9
**period** 72:3
**permit** 62:17
62:20
**permits** 38:8,10
38:12
**person** 20:12
22:6,10
**personal** 49:20
80:11
**place** 2:9 32:12
84:11
**plaintiff** 1:5,16
2:5 8:12,22,23
9:2,3 13:9 85:4
**plaintiff's**
17:23 18:15
50:21 71:7,9
71:13
**plan** 23:24
29:22 79:23
**plans** 23:22
24:19,20 30:6
30:15 82:12,14
82:16
**please** 4:8
62:10 71:22
**plural** 11:18
**point** 5:9 27:15
27:16 32:6
35:7 51:10

52:10 58:7,10
61:18
**policy** 69:3
**polite** 83:5
**position** 45:6
**possibility**
32:21
**possible** 8:14
58:4 61:13
**powder** 31:25
**pre** 29:6,7,8
**premises** 33:11
34:5,7,10
35:18 36:19
37:18,25 38:9
38:15,21 39:3
45:18 48:12
49:5,12,15
51:14,15,21
52:12,21,25
56:5,7,8 57:2
62:18,21,25
66:17
**prepared** 37:18
**preparing**
34:23 38:17
**present** 2:16
4:11 36:13
77:15
**presented** 77:9
**pretend** 42:25
**pretty** 21:17
**previously** 6:20
13:21 41:22

**prior** 13:18
15:10 16:25
21:23 34:18
35:25 46:20,23
66:9
**private** 10:13
**probably** 20:21
21:14 27:4
29:6 64:22
77:18,24 78:3
78:4
**problem** 6:9
**proceed** 5:23
6:4 30:17
**proceeding**
7:14 10:5
**process** 73:7
**produce** 17:18
85:11
**product** 31:25
**prohibited** 5:12
**prospect** 32:17
**provide** 24:16
74:15,19
**provided** 72:23
**provides** 37:14
**public** 1:18 4:4
10:5 56:5
84:22 87:7
88:25
**publish** 60:11
**purely** 38:4
**purposes** 30:20
30:23

**pursuant** 1:16
13:12
**put** 4:15 63:6

**q**

**question** 20:4
54:9,11,11
55:8,24 62:7
76:16 79:17
80:22 86:14
**questions** 5:6
5:10 6:11 10:5
15:18 80:17
86:13
**quickly** 21:18

**r**

**r** 2:2 3:2 4:1,2,2
5:1 6:1 7:1 8:1
9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1,23,23
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1

**[r - required]**                                         Page 13

| | | | |
|---|---|---|---|
| 58:1 59:1 60:1 | 35:23 39:25 | **refers** 63:10 | 59:7,8 61:10 |
| 61:1 62:1 63:1 | 40:16,17 44:13 | 72:7,17 | 61:15,21 65:24 |
| 64:1 65:1 66:1 | 44:15,17,21 | **regarding** 4:21 | 68:12,22 69:5 |
| 67:1 68:1 69:1 | 48:6,15 49:11 | 74:7,25 | 69:6 70:21 |
| 70:1 71:1 72:1 | 49:13,16 51:4 | **regulation** | 73:5,7 74:22 |
| 73:1 74:1 75:1 | 51:7 59:15 | 42:13 | 76:21 77:9 |
| 76:1 77:1 78:1 | 61:5,23 62:2 | **regulations** | 78:13,14,15,17 |
| 79:1 80:1 81:1 | 63:25 64:4 | 61:14 | 78:22 79:5 |
| 82:1 83:1 84:1 | 65:3,9,25 | **related** 87:15 | **rent** 64:2,6 |
| 84:2 85:1 86:1 | 66:12 67:14 | **relationship** | 65:22 |
| 87:1,2 | 70:23 71:2,24 | 19:13,17 22:12 | **repeat** 6:13,15 |
| **racing** 5:7 | 72:2,3,5 73:11 | 47:3,7,9,13 | 11:21 22:17 |
| **rain** 43:13 | 73:13,15 | 82:21,22,24 | 26:8 69:20 |
| **ramifications** | **received** 15:5 | **release** 23:4 | **rephrase** 77:3 |
| 79:17 | 15:23 16:8 | **remain** 42:17 | **replaced** 43:10 |
| **randolph** 74:10 | 60:17 | 42:17 | **reporter** 6:16 |
| 75:17 | **recess** 62:13 | **remember** 7:6 | 17:25 18:17 |
| **range** 41:14 | **recollection** | 8:7 9:8,9 10:18 | 50:23 71:15 |
| **reached** 25:19 | 14:5 19:2 21:8 | 10:18,23 11:3 | **reporting** 88:1 |
| **read** 51:11 | 72:25 | 12:17 13:22 | **represent** |
| **reading** 67:2 | **record** 4:9,16 | 14:25 15:3,25 | 14:12,13 |
| **really** 20:20 | 4:17 5:5,10 | 16:6 17:8 | **representation** |
| 22:2 49:2 | 51:12 80:18,20 | 21:18 22:23 | 12:24 |
| 64:20 77:8 | 87:12 | 23:16 25:3,20 | **represented** |
| **reason** 36:13 | **records** 48:9,14 | 26:2,19 27:3 | 14:16,17 |
| 40:20 88:5 | 64:23 | 28:4,12,13 | **representing** |
| **reasons** 36:8 | **referenced** | 29:5,21,25 | 15:17 |
| 39:2 | 10:16 | 30:3,8,9,21 | **represents** 60:4 |
| **recall** 9:16 12:6 | **referred** 20:24 | 31:3,18 32:3 | **request** 73:2 |
| 12:19 13:3,24 | 41:22 56:12 | 33:2 35:5,8 | 78:19,23 |
| 13:25 17:10 | 72:13 | 36:4 39:22 | **requested** 86:8 |
| 20:19,21 21:4 | **referring** 10:21 | 41:25 42:24 | **requesting** |
| 21:25 22:25 | 14:8 27:23 | 43:18,19,21,23 | 73:17 |
| 23:6 24:17 | 37:4 56:16,22 | 44:8,25 46:5 | **required** 16:8 |
| 29:9,13 35:20 | 61:6 72:10,19 | 51:2 56:13 | 39:9 42:14 |

**[required - shutting]** Page 14

58:21 67:23
69:12,13
**requiring**
21:12
**reserved** 3:22
**resolved** 44:10
**respectful** 83:6
**respective** 3:6
**respond** 16:2
**responded** 58:3
**response** 15:4
41:23
**responsibility**
74:25
**restaurant**
11:10,11 37:25
42:10 52:2,6
52:11,14,16,19
52:24,25 53:7
53:17 55:23,24
62:17 81:24
**restaurants**
11:12 38:3
54:16 60:4
**result** 45:3
57:12
**resume** 80:19
**retail** 30:16,20
30:23 31:4,5,7
31:9,10,13,14
**retained** 85:20
**reveal** 15:7
**review** 59:5
**ride** 60:14

**right** 21:15,19
27:23 33:22
34:19 35:22,23
36:2,18 46:20
52:7,12,14
67:8,11,13
71:24 76:3,10
76:13
**rigos** 1:7 2:17
12:8,11,16
18:10,22 19:4
19:8,24 20:8
21:23 22:3,12
22:25 23:11
25:23 26:12
27:25 32:7
33:24 34:13
35:15 36:16,24
37:7 47:3,7,17
48:14,19,24,25
49:3,4 50:11
50:14,17 56:12
58:10 61:9,12
61:17,24 62:24
63:22 65:22
68:17 70:17,20
71:10,11,18,19
73:2,8,12,17,24
73:24 74:3,17
74:19 75:22
76:3,9,11,19,20
77:5,7 78:5,18
79:11 80:23
81:12,15 82:5
82:13,17,21

83:4 85:16,18
88:2
**risk** 5:13
**rocco** 1:15 4:10
13:14 17:16
36:22 71:20
84:15 85:10
88:3,21
**roof** 39:5 43:9
43:14,15,17
**roughly** 41:8
**rules** 60:13
61:14
**rulings** 86:13

**s**

**s** 2:2 3:2,2 4:2
85:2 88:5
**sake** 34:8
**saw** 72:5
**saying** 56:19
76:5 77:12
**says** 5:22 18:24
51:12 58:11
71:6,9,19,20
74:9 75:24
**schwartz** 2:4
**scope** 5:2
**se** 80:25 81:17
81:19,20
**sealing** 3:7
**second** 16:21
17:17 73:22
**see** 13:21 14:4
56:25 74:6
80:16

**seeing** 17:8,10
51:2,4 71:24
**seek** 59:11
**seen** 13:18,23
17:2 50:25
**segment** 32:25
**send** 32:2 60:12
68:19 71:22
**sending** 78:16
**sent** 11:4
**sentence** 51:19
**series** 71:5
75:21
**served** 18:22
**service** 3:16
37:14 51:16
56:8 62:21
**set** 33:4 87:11
87:20
**shake** 31:25
**shared** 5:25
**sheet** 88:1
**shore** 65:5,13
65:13,16,17
66:4,10
**short** 62:13
**shorthand** 37:3
**shortly** 80:19
**show** 13:11
18:2 48:13
50:10
**showed** 69:4
**shut** 40:25
**shutting** 41:5

**[side - take]**

side  82:25
sign  73:18
  79:20
signature  18:19
  18:21 71:23
  87:22
signed  3:10,12
  3:15 22:13
  75:4 77:2,20
  78:11
significant  39:5
signing  22:14
  22:18 66:22
sit  42:19 64:15
  82:14
sitting  54:5
situation  29:24
  30:18
situations  36:9
six  7:2 49:8,10
  62:25 67:21
  70:11 82:18
slc  1:6
slightly  31:14
sorry  7:4,6
  8:17 11:21
  15:3 19:6 26:8
  30:22 39:18,20
  48:25 50:2
  53:22 61:23
  62:8 63:14
  65:11 66:3,7
  68:6 70:23
  71:19 75:7
  78:2 81:18

sort  23:23 24:7
  26:19 28:16
  30:4 40:14,19
  41:2 57:10
  77:3
sought  59:16
sounds  23:5,7
southern  1:2
  5:21
space  29:16,17
  30:19,23 31:5
  31:8,16 32:13
  33:5,18,20
speak  6:10 44:3
specific  30:9
  32:25 42:2
  56:23 60:22
  78:23
specifically
  24:18 25:4
  26:20 27:3
  29:21 53:2
  61:5,7
specifics  26:2
  28:13 29:25
  30:13 65:25
  73:14
specified  84:11
spoke  26:18,21
  27:18 29:10
ss  87:4
stamp  71:10
  85:17
stand  79:21
  83:4

start  46:20
started  6:19
  41:13 69:4,7
  78:19 79:2
state  1:18 4:4,8
  5:12 9:7 59:8
  87:4,8
statement  4:15
  26:9 51:22
statements
  23:4
states  1:2 51:19
steven  1:3
  27:23 88:2
stipulated  3:5
  3:20
stood  57:9
strategy  30:5
street  31:12
  82:25
struggling
  52:10 59:9,9
  59:10
subject  33:12
  76:14
subpoena  1:16
  13:12,13,19
  14:23 15:24
  16:21,22,23
  17:2,6,14,15,18
  17:18 85:8,11
subscribed
  84:18 88:22
substance
  12:14,20 15:8

substantial
  58:9
sued  8:24
suggested
  30:22
suggesting
  30:19
suit  8:15,18
suite  2:9 4:13
summer  29:12
sure  10:3 16:12
  20:16 22:23
  25:20 52:8
  55:12 56:2
  57:12 58:4
  59:3 65:23,24
  73:19 74:6,11
  75:10 77:11
  79:16
surrogate  9:17
surrogate's  7:2
suspend  38:20
  38:23
suspended  39:3
  40:20
sworn  3:10 4:3
  84:5,18 87:11
  88:22
syosset  2:14

**t**

t  3:2,2 4:2 84:2
  85:2 87:2,2
take  6:17 62:9
  62:11 76:2
  77:11,14 80:15

**[taken - trucks]**                                                    Page 16

| | | | |
|---|---|---|---|
| **taken** 1:15 | **testify** 13:13 | 61:19 62:24 | 40:8,10,12 |
| 62:14 | 17:15 84:5 | 63:24 68:21,22 | 41:15 43:8,20 |
| **talk** 28:8 30:14 | 85:8 | 70:10,11 72:16 | 44:12 48:17 |
| 33:19 36:10 | **testifying** 15:15 | 73:19,21 75:5 | 49:7 63:2 |
| **talked** 28:14 | **testimony** 10:3 | 75:11,13 79:4 | **timing** 35:21 |
| **talking** 33:21 | 10:4 84:6,10 | 79:9 80:14 | **today** 4:25 |
| 48:23 79:19 | 87:13 | 81:2,13 82:9,9 | 11:16,20,23 |
| **technical** 6:9 | **thing** 24:8 | 83:3 | 12:4 13:18 |
| **technically** | 25:22 28:16 | **thirty** 54:14 | 16:25 18:13 |
| 8:20 | 35:17 40:14,19 | 55:15 | 42:19 50:18 |
| **tecum** 16:23 | **things** 12:25 | **thought** 16:13 | 54:18 59:2 |
| **television** 11:14 | 15:15 23:22 | 20:12,16 48:25 | 64:15 |
| **tell** 6:12,23 | 24:7,20,23 | **thousand** 44:24 | **told** 11:19,22 |
| 7:23 13:4 | 25:5,6,7,12,13 | 70:10,12 | 12:20 21:10 |
| 23:13,16 24:25 | 25:15 26:16,21 | **time** 1:11 3:22 | 25:3,4 26:20 |
| 26:12,15,17,24 | 26:22,24,25 | 6:17 7:18,24 | 28:3,4 31:19 |
| 27:20,25 28:6 | 27:8,11,19 | 14:6 16:7 | 69:3 |
| 28:11,17 30:25 | 28:8 29:22 | 27:15 28:22 | **town** 40:24 |
| 44:7 69:2 | 30:7,10 35:6 | 29:3,10 32:7 | **tr** 1:4 |
| 72:21 | 49:18 55:22 | 33:3,24 34:18 | **transcript** 84:9 |
| **telling** 21:6 | 73:20 | 35:2,25 39:17 | 84:9 |
| 22:25 32:4 | **think** 5:6 7:25 | 39:19,21,22 | **transpired** 73:6 |
| 42:12,20 54:18 | 8:15,15 9:3,21 | 41:4,7,16 | 73:20 |
| **ten** 23:15 41:9 | 10:10,15 13:10 | 42:25 46:11 | **trial** 1:14 3:22 |
| 41:17 43:25 | 14:15 20:5,5 | 47:22 49:11 | **tried** 31:22 |
| 44:2 45:4 | 20:14 21:3,17 | 54:15 57:11,15 | **trucks** 4:23 |
| **tenant** 4:22 | 21:18 22:9,15 | 58:16,17 59:20 | 16:22 17:20 |
| 32:22 37:4 | 26:14,18,20 | 64:2 66:21 | 18:20 26:5 |
| **tenants** 31:23 | 29:11 36:8,15 | 67:12,20 74:11 | 32:22 33:3 |
| **term** 55:18 | 38:13 42:2 | 76:2 78:10,11 | 36:21 37:3,8 |
| **terms** 51:23 | 44:24 45:5 | 84:10 | 37:11,13 38:14 |
| 55:11 69:16 | 49:9 50:8 52:3 | **times** 12:15,18 | 45:7 47:25 |
| **testified** 4:5 | 52:8,13,15 | 27:17 28:7,10 | 48:8 64:2 |
| 9:22 10:9 43:7 | 55:18,22 56:15 | 28:20 29:2 | 66:16 80:3,7 |
| 45:2 50:7 | 57:25 58:9 | 38:22 39:4,7 | 85:13 |

**true** 84:9 87:12
**trustee** 1:3
**truth** 84:5
**try** 6:10 25:5,6
25:7,11,14
27:7,11,14,18
28:8 30:17
**trying** 15:20
58:10
**turn** 71:23
**turning** 36:19
**twenty** 46:6,12
**two** 21:20
31:21 66:11
79:3 80:15,18
**typically** 44:19

**u**

**u** 3:2 39:23
**ultimately**
36:12,16 37:9
**unclear** 42:16
**underhill** 2:13
**understand**
6:12 15:10
20:4 22:3
33:19 37:4
52:12 53:8
79:16
**understanding**
40:25 55:4,10
55:16 66:23
72:9,12 73:16
74:2,16 76:17
77:4,16,17

**understood**
67:3
**unhappy** 24:11
**united** 1:2
**unsigned** 3:14
**update** 60:13
**use** 30:19,23
51:23 63:13,16
63:19
**utilities** 69:11
70:13,17
**utility** 70:7

**v**

**v** 88:2
**vacation** 39:8
**variation** 34:4
**various** 45:22
**veer** 5:11
**venture** 32:11
32:12,13
**ventures** 32:9
32:11 82:6
**veritext** 88:1
**version** 33:16
**versions** 71:22
**video** 6:8
**virtual** 1:17
**visit** 29:15
**visited** 29:17
62:25
**visits** 49:14
**vivos** 1:4

**w**

**waived** 3:9
**want** 4:15 5:4,9
13:11 15:18
36:13 40:11,22
51:10 55:14
63:4 66:14
71:3 75:25
**wanted** 5:16
22:6,8 29:15
37:22 67:16
**wanting** 57:14
57:14
**water** 43:13
69:10 70:8,8
**way** 16:3 58:4,9
77:9 87:17
**weeks** 39:8
42:4
**went** 30:4
36:17 59:20
72:4
**whereof** 87:19
**wife** 11:20,23
11:25 12:5
**william** 71:20
74:10
**willing** 35:12
**willingness**
24:23
**witness** 1:15
2:13 3:10,16
3:18 4:3,18
15:7,11,12
18:6 53:23

54:4,7,7 62:5
62:10 75:7
83:8 87:10,13
87:19
**witnesses'** 88:3
**word** 55:22
77:11,15
**words** 69:14
**work** 11:12
23:22 24:6,20
24:23 25:5,6,7
25:12,13,14,18
26:16 27:4,8
27:11,19 28:8
31:4 36:14
57:14
**worked** 54:16
**working** 11:10
36:10 46:10,20
49:18
**world** 42:7,8
**write** 11:13
**writing** 74:22
74:23
**written** 79:22

**x**

**x** 1:3,8 85:2
86:2

**y**

**year** 14:3 23:10
79:2
**years** 7:2 53:12
53:23 54:8,12
54:14 55:15

**[years - zoom]**                                        Page 18

68:10,13
**york**  1:2,18 2:6
2:6,10,10,14
4:4,13,13 5:22
9:6 33:22
37:15 42:7
59:17 60:4,7
65:20 87:4,8
88:1

**z**

**z**  1:7 2:17 50:13
50:17 85:16
88:2
**zoom**  1:17

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.