Page 1

1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - -x

     STEVEN A. CUCULICH, as trustee in Inter

4    Vivos TRII FBO The Cuculich Family,

5                        Plaintiff,

6           -against-

7    JOHN Z. RIGOS,

8                        Defendant.

9

     Index No.:  1:21-cv-6753-SLC

10   - - - - - - - - - - - - - - - - - - - -x

11

                        July 13, 2022

12                      11:02 a.m.

13

14

15            REMOTE EXAMINATION BEFORE TRIAL

16   of JOHN Z. RIGOS, the Defendant in the

17   above-entitled action, held at the above

18   time and date, taken before Maryann Laub, a

19   Notary Public of the State of New York,

20   pursuant to Agreement and stipulations

21   between Counsel.

22

23            *    *    *

24

25

Page 2

```
1
2  APPEARANCES:
3
4  (ALL PARTIES ATTENDING REMOTELY)
5
6    MOREA, SCHWARTZ, BRADHAM,
      FRIEDMAN & BROWN, L.L.P.
7      Attorneys for Plaintiff
        444 Madison Avenue, 4th Floor
8      New York, New York 10022
9    BY: JOHN BRADHAM, ESQ.
10
11
      MORICI & MORICI, L.L.P.
12     Attorneys for Defendant
        60 E. 42nd Street, Suite 2450
13     New York, New York 10165
14   BY: GERARD MORICI, ESQ.
15
16          *   *   *
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2          STIPULATIONS
3     IT IS HEREBY STIPULATED AND AGREED, by
4  and among counsel for the respective
5  parties hereto, that the filing, sealing
6  and certification of the within deposition
7  shall be and the same are hereby waived;
8     IT IS FURTHER STIPULATED AND AGREED that
9  all objections, except as to form of the
10 question, shall be reserved to the time of
11 the trial;
12    IT IS FURTHER STIPULATED AND AGREED that
13 the within deposition may be signed before
14 any Notary Public with the same force and
15 effect as if signed and sworn to before the
16 Court.
17          *   *   *
18
19
20
21
22
23
24
25
```

Page 4

```
1
2  J O H N   Z.   R I G O S, the witness
3    herein, having first been duly sworn
4    remotely by the Notary Public, was
5    examined and testified as follows:
6  EXAMINATION BY
7  MR. BRADHAM:
8    Q.   State your name for the record,
9  please.
10   A.   John Z. Rigos.
11   Q.   Where do you presently reside?
12   A.   45 East 85th Street, Apartment
13 9D, New York, New York 10028.
14       THE REPORTER:  Counsel, are you
15 ordering a copy?
16       MR. MORICI:  Yes.
17       MR. BRADHAM:  Mr. Rigos, I will
18 be taking your deposition today.  I'm
19 John Bradham.  I represent the
20 plaintiff in this matter.
21       I'll be asking various
22 questions.  I would ask you to try to
23 speak as clearly as you can.  We are
24 doing this remotely by Zoom today,
25 which can pose some challenges.  But if
```

Page 5

```
1       J. Z. Rigos
2  we all speak clearly, then I think
3  things will go a lot quicker.
4    Q.   Have you ever had your
5  deposition taken before?
6    A.   Once years ago.
7    Q.   Do you remember the case it was
8  taken in?
9    A.   Yeah.  I am in the restaurant
10 business.  It had to do with somebody
11 slipping on stairs in one of our
12 restaurants.  This is like ten years ago
13 I'm guessing.
14   Q.   Do you by chance remember the
15 name of the case?
16   A.   I don't.
17   Q.   Were you a party in the case?
18   A.   I don't recall.  I am a part of
19 the management team that owns a portfolio
20 restaurant, so I wasn't involved with the
21 operations at that restaurant.  But because
22 I'm part of the management team that
23 oversees the portfolio of restaurants, I
24 guess I was asked to be deposed.
25   Q.   Do you recall the name of the
```

2 (Pages 2 - 5)

**Page 6**

J. Z. Rigos

1  restaurant at issue?
2  A.   Yes.  It was one of the Five
3  Guys restaurants we own in New York City,
4  in Manhattan.
5  Q.   Have you ever testified in court
6  before?
7  A.   No.
8  Q.   Have you discussed the substance
9  of your deposition testimony today with
10 anyone, other than your attorney?
11 A.   No.
12 Q.   You just mentioned you're in the
13 restaurant business.
14       Can you just tell me about your
15 occupation, what you do and how long you've
16 done it for?
17 A.   Sure.  So I'm part of a company
18 that owns a portfolio of different
19 restaurant brands, and each brand has
20 multiple locations.  And I oversee, you
21 know, the performance of the restaurants.
22 And I work with the brand leaders to ensure
23 they are operating their restaurants well.
24 And that's really it.

**Page 7**

J. Z. Rigos

1  Q.   What's the name of this company
2  that you are part of the management team
3  of?
4  A.   Sure.  The name of the company
5  is Aurify Brands, that's spelled
6  A-U-R-I-F-Y.
7  Q.   Are you the part owner in that
8  business?
9  A.   I am.
10 Q.   There are other part owners?
11 A.   Yes.
12 Q.   Is Rocco DiSpirito a part owner?
13 A.   No.
14 Q.   What type of restaurants does it
15 own?
16 A.   So we own primarily what's
17 called fast casual restaurants.  Like Five
18 Guys is a fast casual restaurant that we
19 view other brands in that category.
20 Q.   Are these restaurants all in New
21 York or are they spread out in other areas?
22 A.   Primarily New York City,
23 Manhattan and Brooklyn.  Then we have a few
24 locations in Washington D.C. and the

**Page 8**

J. Z. Rigos

1  environs.
2  Q.   How long have you been in the
3  restaurant business?
4  A.   About 18 years.
5  Q.   Have you ever actually worked in
6  a restaurant yourself?
7  A.   No.
8  Q.   But it would be fair to say you
9  are very knowledgeable about the restaurant
10 business?
11 A.   Yes.
12 Q.   In particular in New York?
13 A.   Yes.
14 Q.   Are you familiar with the type
15 of Government permits that are required to
16 operate a business in New York?
17 A.   I wouldn't say I am an expert at
18 it.  I have familiarity with it.  We have
19 people that worry about permitting and
20 compliance and things like that.
21       So my expertise is more on the
22 business strategy side of the equation, not
23 necessarily the mechanics of day-to-day
24 operations.

**Page 9**

J. Z. Rigos

1  Q.   These restaurants your company
2  owns, you mentioned Five Guys, are there
3  other brands as well?
4  A.   There are other brands.  Yes.
5  Q.   What are those?
6  A.   They range from Le Pain
7  Quotidien, which means the daily bread.
8  Other brands are Melt Shop and Little Beet.
9  Q.   Le Pain Quotidien, did your
10 company acquire that after the Belgian, I
11 believe, company went bankrupt?
12 A.   Correct.  We bought it last
13 summer during the throws of the pandemic
14 via a bankruptcy process.
15 Q.   I'm a big fan.
16 A.   Fantastic.
17 Q.   I was one of your better
18 customers.
19       I take it you know Rocco
20 DiSpirito?
21 A.   Yes.
22 Q.   How did you come to know him?
23 A.   So a mutual friend introduced
24 us.  I'm guessing it's around ten years

**Page 10**

J. Z. Rigos

1
2 ago, eight to ten years ago. Rocco was in
3 the process of building a diet weight loss
4 management business where, if you were a
5 client, he would provide you with all the
6 meals you would need each day for, say, a
7 month. And that meal program was very low
8 calorie. And you would lose weight
9 sticking to his diet plan. That was the
10 business he was pursuing.
11    Q.   Is that the business he was
12 operating at the premises that are at issue
13 in this lawsuit?
14    A.   I believe that is the business
15 he was building there. And he was making
16 shakes and other food stuff that he would
17 package and deliver. Yes.
18    Q.   So he would prepare these diet
19 weight loss foods at the premises and then
20 deliver them to customers?
21    A.   Correct.
22    Q.   You are in this case because you
23 are the guarantor of his lease.
24       Have you done other business
25 with Mr. DiSpirito other than that?

**Page 11**

J. Z. Rigos

1
2    A.   I wouldn't even say I did
3 business with him on that. No. I have not
4 done anything with Rocco. And why I'm here
5 is very strange.
6       I guess I will wait for you to
7 ask any questions you want to ask to
8 extract that information.
9    Q.   I'm sure we will get to the
10 strangeness of it.
11    A.   Yes.
12    Q.   Have you discussed this case
13 that you are a defendant in with
14 Mr. DiSpirito?
15    A.   Only in the context of I can't
16 believe I'm dealing with this.
17    Q.   Would it be fair to say you have
18 expressed your displeasure to him that
19 you're a defendant in this lawsuit and
20 involved in this?
21    A.   Absolutely.
22    Q.   Has he responded to that with
23 anything?
24    A.   He responds basically saying,
25 I'm doing everything I can to get you not

**Page 12**

J. Z. Rigos

1
2 to be involved with this.
3       And this has been going on for
4 some time, and I don't know that any
5 progress has been made.
6    Q.   I didn't hear the last thing you
7 said.
8    A.   I don't know that any progress
9 has been made. He keeps assuring me he is
10 doing everything possible to remove me from
11 this lawsuit, but I don't really know
12 what's going on.
13    Q.   Have these been phone
14 conversations you have had with him or
15 E-mails? How have you had these
16 communications?
17    A.   Primarily having a periodic call
18 when I get a notice from somebody that
19 something is happening. And I will call
20 and say what's going on.
21    Q.   Have you had any E-mail
22 communications with him about this case?
23    A.   I don't think very much. And if
24 I have, I would have provided it to my
25 counsel. Because they asked me to provide

**Page 13**

J. Z. Rigos

1
2 anything in writing. But I don't recall
3 off the top of my head now anything
4 material or particular beyond the
5 occasional expression of frustration.
6 That's all that would be in the E-mail.
7    Q.   Do you text Mr. DiSpirito?
8    A.   Again, in the context of if I'm
9 notified that I'm needed for something or
10 something is happening, I may text and say,
11 what's going on.
12    Q.   So you may have had texts with
13 him about this case?
14    A.   Yeah. But I wouldn't spend much
15 time typing via text. I would probably
16 just get on a call to talk.
17    Q.   I don't mean to --
18    A.   No. Please.
19    Q.   I'm just trying to understand.
20       Do you know as you sit here
21 today whether you have had texts with him
22 about this case?
23    A.   I'm sure I have texted saying, I
24 can't believe I am still involved. I can't
25 believe this is happening. Please resolve

Page 14

```
1            J. Z. Rigos
2  it.
3      Q.    Has he responded to those texts?
4      A.    I'm sure he has responded and
5  said, I will do whatever I can.  Something
6  in that vein.
7      Q.    Do you think those responses
8  were by text from him to you?
9      A.    Yeah.  I am sure there are a
10 couple of those kinds of texts.
11     Q.    In terms of E-mails you have had
12 with him about this case, you believe any
13 E-mail communications you have had with him
14 you would have given to your counsel?
15     A.    Correct.
16     Q.    Other than your attorney, have
17 you discussed this case with anyone, and
18 other than Mr. DiSpirito?
19     A.    No.  It's embarrassing.
20     Q.    Why is it embarrassing?
21     A.    So back to when all of this
22 began.  And again, I believe it was 2014
23 when the lease was signed.  I thought his
24 business model was interesting, but I had
25 no involvement.
```

Page 15

```
1            J. Z. Rigos
2            He said, hey, I found this
3  location.  It's great.  I'm going to take
4  this spot.  I'm going to use it as my
5  commissary kitchen to build my business.
6  Good for you.  But I have a favor to ask
7  you.
8            I want to be very specific.  He
9  was just barely a new friend, but I thought
10 he was a nice guy.  I liked that he was
11 entrepreneurial, trying to build a
12 business.
13           He said, my issue is that I need
14 to have someone sign a guarantee.  Why
15 can't you sign the guarantee, I asked?  He
16 said, well, the landlord wants me to
17 disclose all of my financials.
18           And this was probably the
19 stupidest thing I have ever -- amongst the
20 stupidest things in my life.  Certainly the
21 stupidest thing I have ever done in
22 business.
23           He said, I don't want to
24 disclose my financials because, you know, I
25 am a celebrity.  If somehow it gets out and
```

Page 16

```
1            J. Z. Rigos
2  everybody knows, it will be really
3  embarrassing for me to have my financials
4  out there.  So can you just do me this
5  favor and sign the guarantee.
6            I said, Rocco, could you assure
7  me that you are financially creditworthy
8  and there's no issue at all?  If something
9  were to happen, you have it covered that I
10 never have to deal with this?  He said,
11 yes.  I guarantee you.  Of course.  I said,
12 okay.  You are assuring me.  I am taking
13 you at your word for it.
14           And that was it.  Then I said I
15 would sign the lease.  Incredibly
16 embarrassing.  The stupidest thing I have
17 ever done.  Not the lease, I signed the
18 guarantee.
19     Q.    Sitting here today, do you
20 believe what he told you, as you just
21 recited, it was truthful?
22     A.    So on a recent call when I was
23 angry with him, like, I can't believe this
24 is actually happening, I said, Rocco, I
25 think you lied to me then when you said
```

Page 17

```
1            J. Z. Rigos
2  this was not an issue.  He said, no, it
3  wasn't an issue then, but the pandemic has
4  destroyed me.  And I'm sorry, but I'm not
5  in the same creditworthiness position as I
6  was then.
7            Then I said, okay.  This has
8  nothing to do with me.  You and I have not
9  spoken or seen each other in years.  You
10 are not even a friend.  That I am dealing
11 with this is incredibly offensive to me.
12 You must have friend and family that can
13 deal with this on your behalf.  He said, I
14 am doing all I can.
15     Q.    Sitting here today -- so it
16 would have been back in 2014 when he told
17 you that he was a celebrity so he didn't
18 want to release his finances, correct?
19     A.    Yes.
20     Q.    Do you believe that that was an
21 accurate statement, that that's why he
22 didn't want to release his finances?
23     A.    I believed that then, and it
24 made sense then, because he was one of the
25 most regarded celebrity chefs.  He lived in
```

5 (Pages 14 - 17)

Page 18

```
1           J. Z. Rigos
2  Tribeca in a nice apartment.  I haven't
3  seen it.  I am told.  He had multiple books
4  he sold.  He was on speaking tours.  He had
5  a show on TV.
6           Seemed to be a pretty successful
7  guy that could he come up with -- at the
8  time I believe it was 150 grand or whatever
9  it was.  If things went south, I assumed it
10 wasn't an issue.  So I believed him then.
11          Do I believe today that all of
12 that was as it appeared?  I don't really
13 know.  I would be speculating.  I just
14 don't know.
15          MR. BRADHAM:  What I want to go
16 ahead and make Exhibit 1 is the
17 agreement of lease dated November 3,
18 2014.  That's Bates stamped Rigos
19 000002 through 000032.
20          (Whereupon, the lease was hereby
21 marked as Plaintiff's Exhibit 1 for
22 identification, as of this date, by the
23 reporter.)
24 Q.    Do you have that with you?
25 A.    I'm not sure what you were just
```

Page 19

```
1           J. Z. Rigos
2  referring to.
3           Are you referring to the lease
4  itself that was attached to a letter?
5  There was a letter dated July 12, 2021 from
6  you, John, to me.  That, yes, I have in
7  front of me.
8  Q.    I was just -- your counsel
9  produced it in his production, so it had
10 Bates stamps on it.  As long as you have a
11 copy of it, that's all we need.
12 A.    Yes.  I'm looking at the lease.
13 Q.    Are you generally familiar with
14 this document?
15 A.    I'm generally familiar with
16 leases.  This I have not looked at.  I
17 didn't even look at it then, to be honest
18 with you.
19 Q.    So let's go to the last page.
20          You see your signature there
21 under guarantor?  That's your signature?
22 A.    Hold on.  Let me get down to the
23 last page.  I see there's E-mails that are
24 attached.  It looks like the last few
25 pages.
```

Page 20

```
1           J. Z. Rigos
2           MR. MORICI:  On the bottom
3  right, do you see the Rigos 000
4  numbers?
5           THE WITNESS:  Yes, I do.
6           MR. MORICI:  So, John, he does
7  have the produced version.  If you can
8  give him the Bates number, that should
9  help out.
10 Q.    Do you have the Bates stamped
11 document in front of you?
12 A.    Yes.
13 Q.    It would be -- the last page
14 would be Rigos 000032.
15 A.    32.  Okay.  Hold on.  The
16 numbers that I was looking at are in the
17 200s, so I'm scrolling back.  32 is what
18 you are asking me to look at.  Hold on.
19 Q.    Sounds like you have the
20 document production.  Just go sort of to
21 the front of it.
22 A.    Yeah.  Okay.  There it is.  32.
23       That's my signature.  Yes.
24 Q.    So that's your signature.
25       I believe what you said
```

Page 21

```
1           J. Z. Rigos
2  previously was you didn't even review this
3  at the time you had entered into it; is
4  that accurate?
5  A.    I may have given it a cursory
6  look, but I did not review the lease as if
7  it were my lease that I was signing.
8  Q.    If you look at the same
9  signature page there, the tenant is
10 Flavorworks Truck LLC d/b/a of the
11 Delicious Life by Rocco DiSpirito.
12       That is the business you were
13 previously referring to, his fitness
14 business?
15 A.    I don't know what the name of
16 the business was.  But sure, it was Rocco's
17 business.  Rocco is the name of the
18 business.  Do you know what I mean?
19 Q.    So to your knowledge, the
20 tenant, this business is owned by Rocco
21 DiSpirito?
22 A.    Yes.
23 Q.    Are there any other owners, to
24 your knowledge?
25 A.    I have no knowledge.
```

6 (Pages 18 - 21)

Page 22

J. Z. Rigos

Q. Again, I believe you talked a little earlier about what it does.

Is it correct that you testified that he is operating a business on the premises whereby he prepares fitness-related foods and then delivers them to customers elsewhere? Is that correct?

A. I have never visited the facility to tell you that's what happens there, but I believe he produces meals for weight loss that he would produce in that kitchen, then deliver to his clients, yes.

Q. You have never visited the premises before?

A. No.

Q. You said that's what you believe. Why do you believe that? What's your basis for that?

A. I have no reason to believe when he told me he found a commercial kitchen in -- I believe this is Astoria or Long Island City, where he was going to produce his meal kits, that he did that.

Page 23

J. Z. Rigos

Q. So when you became guarantor, this is what he told you he was going to be doing at the premises?

A. Yes. Correct.

Q. Let's go to the same document we're looking at. If you go to article 37, which is on page 25.

A. Article 37 on page 25. Yes.

Q. And that's Rigos number 26.

A. Yes.

Q. This is the guarantee which is what brings you into this lawsuit. I'm going to go ahead and read for the record the first couple -- I won't read the entire guarantee, but I'll read the first two sentences.

Paragraph 37.1 says, guarantor hereby expressly, absolutely, unconditionally, and irrevocably guarantees without setoff or deduction, jointly and severally, the prompt payment (and lawful money of the United States) when due by the tenant of all moneys now or hereafter due the landlord pursuant to the lease

Page 24

J. Z. Rigos

(collectively "payment obligations") any prompt and proper performance by the tenant of all its obligations to the landlord pursuant to the lease, other than those relating to the payment of money (collectively "non-payment obligations" all such payment obligations and non-payment obligations being hereinafter collectively referred to as "the guaranteed obligations").

My question to you is, do you believe that you have complied with that, those first two sentences that I read?

A. No.

Q. Why do you believe you have not complied with that?

MR. MORICI: Objection to the extent that there are other caveats and a lot of other language here that conditions that language. But I will let him answer the question. Obviously there's other language just in that paragraph.

MR. BRADHAM: There's a question

Page 25

J. Z. Rigos

pending. That's coaching the witness when there is a question pending. That's not appropriate. Let's try to avoid this needless acrimony with this kind of stuff or this deposition will take a lot longer than it need be.

MR. MORICI: Read the whole paragraph then before you ask a specific question.

MR. BRADHAM: Again, I'm taking this deposition. You will have ample opportunity when I have completed my questions to ask him any questions you would like to.

In the interim, you don't have the right to object. You can object to my questions, but you don't have the right to ask your own questions and start instructing the witness while my questions are pending.

If you persist doing so, I assure you, I will take this up with the court.

Q. Mr. Rigos, I will ask you again.

Page 26

J. Z. Rigos

1
2      You said you have not complied
3  with the guarantee, the two sentences I
4  read.  Can you tell me why?
5      A.    Because I signed that guarantee
6  predicated on the belief that Rocco was
7  entirely responsible for this and I would
8  never be liable for any of this.
9      Q.    So your point is that you
10  believe that Rocco did not tell you the
11  truth?
12      A.    Yes.
13      Q.    I'd like to go to paragraph
14  37.6.  You are free to read the entire
15  paragraph and take as much time that you
16  want, but I would like to read for the
17  record the first sentence.
18      A.    Paragraph -- I'm sorry.  Which
19  one, John?
20      Q.    Paragraph 37.6 on page 27 of the
21  lease.  It's on Rigos 28.
22      Do you see it?
23      A.    Yep.  I see it.
24      Q.    I'm going to read for the record
25  the first sentence.

Page 27

J. Z. Rigos

1
2      37.6.  Guarantor assumes the
3  responsibility for being and keeping itself
4  informed of the financial condition of the
5  tenant and of all other circumstances
6  bearing upon the risk of non-payment or
7  non-performance by the tenant of the
8  guaranteed obligations which diligent
9  inquiry would reveal and represents that it
10  has adequate means of obtaining such
11  financial information from the tenant on a
12  continuing basis.
13      So my question to you is, do you
14  believe that you have complied with the
15  provision of paragraph 37.6 that I just
16  read?
17      A.    Again, I relied on Rocco to be
18  telling me the truth.  So I was fooled and
19  lied to.  And I'm the victim.  Then no.  I
20  have not done that.  I was fooled, like a
21  lot of people are.
22      Q.    So that you think Mr. DiSpirito
23  fooled you on this?
24      A.    Again, I can't tell you he
25  didn't have more financial wherewithal than

Page 28

J. Z. Rigos

1
2  he has today, I don't know, but my
3  understanding with him was crystal clear
4  that I would never have to deal with any of
5  this.
6      And I was simply making an
7  accommodation for him to secure this lease
8  so he would not have to disclose his
9  financials to the landlord.  I have zero --
10  can I expound, John, or no?
11      Q.    I'm sorry?
12      A.    Do you mind if I expound?
13      Q.    Of course, feel free.
14      A.    I would like to be clear, if
15  it's not clear.  I have zero economic
16  interest in anything Rocco does.  I am not
17  a friend of Rocco's.  I never had an
18  interest.  I never was a business partner.
19  It was literally just a stupid thing I did.
20  And now I'm dealing with it.
21      So I have zero interest in any
22  of this.  I don't know the guy.  I have
23  never been in his home.  I have never done
24  anything with him, other than met him a
25  handful of times and was fooled to do

Page 29

J. Z. Rigos

1
2  something so stupid.
3      Q.    Thank you for that explanation.
4  I understand the predicament you find
5  yourself in.  I'm not trying to torture you
6  over it, but I have to ask you these
7  questions.
8      A.    Please.
9      Q.    I kind of want to break down
10  paragraph 37.6.
11      Did you keep yourself informed
12  of the financial condition of the tenant?
13      A.    No.
14      Q.    Do you know what his financial
15  condition is now?
16      A.    No.
17      Q.    When you signed the lease, you
18  testified that Mr. Rocco told you he was a
19  celebrity and he couldn't disclose his
20  finances.
21      But was there any other inquiry
22  you made or did regarding the finances of
23  the tenant?
24      A.    Just conversation.  I asked for
25  assurances that he had the financial

8 (Pages 26 - 29)

Page 30

J. Z. Rigos

1           J. Z. Rigos
2  wherewithal that should the business not be
3  successful that he would be able to take
4  care of any obligations and I would never
5  be a party to any of this.
6      Q.    You didn't obtain any financial
7  statements or financial background from him
8  at the time?
9      A.    No.
10     Q.    Or subsequently?
11     A.    No.
12     Q.    After you signed the lease as
13 guarantor, between that time and the time
14 that this lawsuit started, did you have any
15 involvement with Mr. DiSpirito?
16     A.    Zero.
17     Q.    So no involvement with him or
18 the business he was operating at the
19 premises?
20     A.    No.
21         MR. BRADHAM:  Now I would like
22  to mark as Exhibit 2 your declaration.
23  That's dated November 17, 2021.
24         (Whereupon, the declaration was
25  hereby marked as Plaintiff's Exhibit 2

Page 31

J. Z. Rigos

1           J. Z. Rigos
2   for identification, as of this date, by
3   the reporter.)
4      Q.    Do you have a copy of that?
5      A.    Yes.
6      Q.    You are familiar with this
7  document?
8      A.    Yes.
9      Q.    When was the last time you
10 reviewed it?
11     A.    The declaration of John Rigos?
12     Q.    Yes.
13     A.    I read it this morning.
14     Q.    Just to be clear for the record.
15 We are talking about your November 17, 2021
16 declaration that was filed in this case,
17 and we're marking it as Exhibit 2.
18     A.    Yes.
19     Q.    Going to the second page, is
20 this your signature?
21     A.    Yes.
22     Q.    I want to go to the first
23 paragraph.  I will read it.
24         It says, I am the defendant in
25 this action.  I have knowledge of the facts

Page 32

J. Z. Rigos

1           J. Z. Rigos
2  and circumstances set forth below based on
3  my personal knowledge and review of my
4  books and records.  I submit this
5  declaration in support of my motion to
6  dismiss the amended complaint of plaintiff
7  Steven A. Cuculich, as trustee of Inter
8  Vivos TRII FBO the Cuculich family
9  landlord.
10         You refer to reviewing books and
11 records.  What books and records did you
12 review?
13     A.    I'm not sure what a book is in
14 this context.  My records are my E-mails
15 and any files I may have in connection with
16 any of this.
17     Q.    What E-mails and files do you
18 have in connection with this?
19     A.    Whatever has been provided.
20 Again, there's very little in terms of
21 communications, E-mails, texts, because the
22 situation is as simple as I'm conveying,
23 which is, I was fooled into signing a
24 document I never should have signed and I
25 have nothing to do with and I regret.

Page 33

J. Z. Rigos

1           J. Z. Rigos
2  There's nothing -- other than that, that's
3  the reality of the situation.
4         MR. BRADHAM:  The screen has
5   just gone away.
6         MR. MORICI:  Off the record.
7         (Whereupon, a discussion was
8   held off the record.)
9      Q.    I'd like to now go to paragraph
10 three.  Let me just ask you to read the
11 first sentence, Mr. Rigos.
12     A.    Sure.  Paragraph three.
13 Flavorworks operates a drinking and eating
14 establishment at the premises.  In or about
15 March 2020 Flavorworks ceased its
16 on-premises food and beverage service to
17 comply with the emergency executive orders
18 issued by former Governor Andrew Cuomo.
19     Q.    Based on what you've previously
20 testified, my understanding is what
21 Mr. Rocco was doing was he was making -- he
22 was preparing certain fitness foods here
23 and then delivering it to customers
24 off-site, correct?
25     A.    Correct.  Weight loss.  Sorry.

9 (Pages 30 - 33)

Page 34

```
1           J. Z. Rigos
2  Not that it makes a big difference, but it
3  was weight loss, not fitness necessarily.
4      Q.    Weight loss products.
5           So he was not actually serving
6  those customers on the premises?
7      A.    I don't know definitively.  I
8  don't believe so.  Because I believe this
9  is a commercial kitchen.
10     Q.    What do you mean by "commercial
11 kitchen"?
12     A.    Commercial kitchen does not
13 typically have customers come in and sit
14 and be served food.  A commercial kitchen
15 is simply a functional space with equipment
16 to produce products.
17     Q.    So --
18     A.    I don't know that that's what
19 the space is.  I'm assuming that's what it
20 is, because I haven't seen it.
21     Q.    So your understanding is, it was
22 not a restaurant?
23     A.    Correct.  I believe it was not a
24 restaurant.
25     Q.    I think you testified that you
```

Page 35

```
1           J. Z. Rigos
2  had never visited the space.
3      A.    Correct.
4      Q.    When you testified that it was
5  not a restaurant, what's your basis for
6  that?
7      A.    Combination of believing that I
8  was told it was a commercial kitchen, which
9  again is not a restaurant.  And even during
10 my conversations with Steven Cuculich,
11 which I had multiple conversations with
12 Steven, I believe he conveyed that this was
13 a fully-equipped commercial kitchen.
14 That's it.
15     Q.    You have no reason to believe
16 that Mr. Rocco ever operated a restaurant
17 there?
18     A.    I have no basis to know if he
19 did or didn't, other than what I've
20 expressed.
21     Q.    But when you say -- in paragraph
22 three you talk about a drinking and eating
23 establishment at the premises, an
24 on-premises food and beverage service.
25           Let's be clear.  You are not
```

Page 36

```
1           J. Z. Rigos
2  testifying that there was a restaurant ever
3  operating there?
4      A.    I don't know if there was or
5  wasn't.  I believe he prepared food and
6  drinks for his customers for consumption
7  off-site.
8      Q.    Do you have any knowledge of any
9  Government permits that the tenant has to
10 operate its facility there?
11     A.    I don't know specifically what a
12 commercial kitchen requires, no.
13     Q.    You say in here in paragraph
14 three that Flavorworks ceased its
15 on-premises food and beverage service to
16 comply with the emergency executive orders
17 issued by Governor Andrew Cuomo.
18           What executive orders are you
19 referring to?
20     A.    When the pandemic appeared or
21 hit in the middle of March, every food and
22 beverage company, restaurant, shut down.
23     Q.    But do you believe that -- are
24 you saying that you believe that a
25 commercial kitchen was required to cease
```

Page 37

```
1           J. Z. Rigos
2  operations?
3      A.    I'm assuming as much.  Yes.  I
4  don't know definitively.
5      Q.    You are saying you are assuming
6  those executive orders covered commercial
7  kitchens.
8      A.    I'm assuming.  Yes.
9      Q.    And that's why you said what you
10 said in paragraph three?
11     A.    Correct.  We shut down every one
12 of our restaurants when COVID appeared.
13     Q.    Your restaurants.  But does your
14 company operate any commercial kitchens?
15     A.    No.
16     Q.    And what is your basis for
17 saying that I believe those executive
18 orders encompassed commercial kitchens?
19     A.    Because everybody I know in the
20 restaurant world shut down operations.  I'm
21 assuming that would also apply to
22 Flavorworks.
23     Q.    For a commercial kitchen?
24     A.    Yes.
25     Q.    But that's your assumption.  You
```

10 (Pages 34 - 37)

Page 38

```
1             J. Z. Rigos
2    don't have any basis to actually know that?
3       A.   He acquired Le Pain Quotidien,
4    which operates a commercial kitchen, a
5    production facility.  It's not a commercial
6    kitchen.  It's a -- production facility is
7    the nomenclature we use, after all of this
8    happened.  And my understanding is they
9    shut down their production facility, just
10   like every other food establishment I know
11   shut down their facilities.  So I'm
12   assuming that Rocco shut down his facility
13   as well.
14      Q.   Do you know that he shut down
15   his facility?
16      A.   I do not know.
17      Q.   But you say in paragraph three
18   that Flavorworks ceased its on-premises
19   food and beverage service.
20           So if you don't know, why did
21   you say that?
22      A.   Because 99.9 percent of people
23   that are in this business that I know shut
24   down their facilities.  So I'm assuming,
25   unless he is the one in a thousand, he did
```

Page 39

```
1             J. Z. Rigos
2    too.
3       Q.   But do you know of any
4    commercial kitchens that actually shut down
5    their business during the pandemic?
6       A.   I didn't proactively go out
7    there and ask people if they shut down
8    their kitchens.  But there are many other
9    brands in New York City that I know that
10   operate a commercial kitchen, although, I
11   have no interest in their business.  I know
12   when they shut down their restaurants,
13   which are supported by their commissaries
14   or commercial kitchens, they shut that down
15   as well.
16      Q.   But you are referring to
17   commercial kitchens that were supplying
18   restaurants, as opposed to commercial
19   kitchens who were supplying individual
20   customers, right?
21      A.   Correct.
22      Q.   So if a restaurant had to shut
23   down, presumably you would shut down the
24   commercial kitchen too because there's
25   nothing to supply?
```

Page 40

```
1             J. Z. Rigos
2       A.   Correct.
3       Q.   But when a commercial kitchen is
4    supplying individuals, that's a different
5    situation, isn't it?
6       A.   It is.  I would assume they
7    would shut down as well.
8       Q.   Did you ever discuss this with
9    Rocco or anyone as to whether they shut
10   down the business?
11      A.   I don't recall a specific
12   conversation, but I believe at some point
13   when we spoke he said they stopped
14   operating.
15      Q.   You believe he said that at some
16   point when you spoke to him?
17      A.   Yes.  I can't tell you
18   definitively.  I don't remember the
19   specific conversation.  But I know that --
20   I lived in Manhattan.  Everything shut
21   down.  That's all I know.
22      Q.   Again, your basis for this
23   paragraph three is your general
24   understanding of what was happening in
25   Manhattan, but you have no specific
```

Page 41

```
1             J. Z. Rigos
2    knowledge here of what happened at this
3    facility?
4       A.   Correct.
5       Q.   Then if we can go to paragraph
6    four.  You say, although landlord's amended
7    complaint is unclear as to the time period
8    of the unpaid rent that it is seeking to
9    recover from me, it appears that landlord
10   is seeking damages based on an alleged
11   default by Flavorworks that includes
12   arrears that accrued from and after March
13   2020.
14           Can you tell me your basis for
15   that statement?
16      A.   I was sued to pay for rent
17   that's due.  So I'm assuming that that's
18   what this is all about.
19      Q.   But do you know when the actual
20   default -- do you know when the actual
21   default of the tenant occurred?
22      A.   I do not.
23      Q.   Do you actually know what rent
24   the landlord is seeking, for what period of
25   time?
```

11 (Pages 38 - 41)

Page 42

J. Z. Rigos

1
2    A.   I do not, other than what the
3 letter said that you sent me, which said
4 you were looking for $150,000.
5    Q.   So that's your only knowledge on
6 this?
7    A.   Yes.
8    Q.   You just mentioned a minute ago
9 various conversations you had with Steve
10 Cuculich.
11          Can you tell me what
12 conversations you had with him, when and
13 what you recall?
14    A.   Yes.  I don't recall the first
15 time he called me, but I would say we
16 probably had five conversations over the
17 last few years.
18          I want to be clear.  I was
19 always incredibly accommodating and
20 friendly and constructive in trying to help
21 him deal with the situation.
22 Notwithstanding that, I did sign the
23 guarantee, and I acknowledge that, I have
24 nothing to do with it.
25          I have a life, a family, a

Page 43

J. Z. Rigos

1
2 business that consumes me.  And I have
3 nothing to do with Rocco DiSpirito, other
4 than a stupid move that I made eight years
5 ago.
6          On each one of those
7 conversations with Steve, I said, Steve, I
8 have nothing to do with this.  I explained
9 to him the reality of what happened.  I
10 said, I will do whatever I can.  I will
11 call Rocco and tell him to work with you
12 and make sure he starts paying.
13          I would call Rocco and say, what
14 the hell is going on?  Pay the guy.  Pay
15 the guy.  Pay the guy.  I have no idea what
16 was paid or not paid.  I never got into the
17 numbers.
18          Then at one point Steve said, do
19 me a favor, just have him get out of the
20 space.  I said, okay.  I don't speak to the
21 guy, but I will call him.
22          Rocco, Steve wants you to just
23 get out of the space.  Just give it to him.
24 Why am I even involved here?
25          That was the sentiment and the

Page 44

J. Z. Rigos

1
2 tenor of the conversations I have had with
3 Steve.  Cordial with Steve, annoyed with
4 Rocco, and desperately trying to remove
5 myself from that entire thing, like I am
6 right now.
7    Q.   Do you remember anything else
8 that Mr. Cuculich told you, other than what
9 you just testified to?
10    A.   No.  I don't know.  I mean, I
11 can't think of anything.  If there's
12 something specific you can ask me, I'll
13 tell you if I remember it.  But I don't
14 remember -- that was the nature of our
15 conversations.  Help me solve this problem
16 with Rocco.  And I tried every time.
17    Q.   So after you spoke to
18 Mr. Cuculich about this, did you speak to
19 Mr. DiSpirito?
20    A.   Yes.
21    Q.   What did you tell him?
22    A.   I would say, the landlord has
23 called me.  He's very upset with you.  You
24 haven't paid rent.  You made a promise you
25 haven't kept.  What's going on?

Page 45

J. Z. Rigos

1
2          I never got involved in the
3 details, the particulars, the dollars.
4 None of that was I aware of.
5          Are you resolving this?  Yes,
6 John, I am resolving this.  Don't worry.
7 Okay.  Please take care of it.
8          I probably had several of those
9 kinds of calls first with the landlord and
10 then with Rocco.  And that's all -- I never
11 wanted to think about this.  So I would
12 immediately end any thought of the
13 situation after those two calls.
14    Q.   When was the last time you spoke
15 to Mr. DiSpirito?  Do you recall?
16    A.   I don't know specifically, but I
17 probably spoke to him a month ago or so.
18 I'm not sure what prompted it, but
19 something would have prompted it.  Meaning
20 something with this would have prompted me
21 to say, what's going on?  Is this done?
22    Q.   Do you recall anything else
23 about the conversation?
24    A.   No.
25    Q.   Did Mr. DiSpirito give you an

12 (Pages 42 - 45)

Page 46

1          J. Z. Rigos
2  indemnity for serving as guarantor under
3  the lease?
4      A.    Yes.
5      Q.    Was there actually a document
6  that was finalized and signed by both you
7  and Mr. DiSpirito?
8      A.    I assume there was, but I have
9  not been able to find a signed document.
10     Q.    You have not been able to find
11  it?
12     A.    Correct.  I don't think --
13  sorry, John.  I don't think anybody would
14  dispute that there's the existence of that
15  obligation between Rocco and me.  Meaning
16  even if I don't have a signed copy, I
17  believe Rocco will acknowledge there's
18  supposed to be a signed copy to indemnify
19  me against this.  Yes.
20     Q.    What I would like you to go to,
21  I think you have it on your screen, the
22  documents that are produced with Bates
23  stamps.  If you go to Rigos 204 through
24  Rigos -- just go to Rigos 204.
25     A.    Yep.

Page 47

1          J. Z. Rigos
2          MR. BRADHAM:  What I am going to
3  make as an exhibit will be Rigos 204
4  through Rigos 211.  We'll make that
5  Exhibit 3.  It's a collection of
6  E-mails.  At the end there is a draft
7  document that appears to be a draft
8  indemnity agreement.
9          (Whereupon, the E-mails and
10  draft document was hereby marked as
11  Plaintiff's Exhibit 3 for
12  identification, as of this date, by the
13  reporter.)
14     Q.    I would like to ask you now,
15  looking at Exhibit 3, which again is Rigos
16  204 through Rigos 211, if you go to Rigos
17  210 and 211 --
18     A.    210.  Yep.
19     Q.    You said you believe you have an
20  indemnity agreement.
21          Is this a draft of that
22  indemnity agreement you have with
23  Mr. DiSpirito?
24     A.    I assume this is a draft of that
25  agreement.  Yes.

Page 48

1          J. Z. Rigos
2      Q.    After this action was filed, did
3  you tell Mr. DiSpirito that he has to
4  indemnify you and assume your defense?
5      A.    I'm sure I did when this all
6  arose.  Yes.
7      Q.    Do you recall his response to
8  that?
9      A.    I don't recall the actual
10  response, but I'm going to assume --
11  because if it were anything other than the
12  obvious response I would recall, i.e., if
13  he contested or challenged, I am sure he
14  said yes, there is an indemnification.
15  Don't worry.  Thank you.
16     Q.    Has he paid any of your
17  attorney's fees in this action?
18     A.    No.
19     Q.    Have you asked him to pay
20  specific attorney fees?
21     A.    I have not gotten an invoice as
22  of this point, but I intend on making sure
23  that those invoices are covered.  Yes.
24     Q.    So you have not received an
25  invoice.  But when you do, you intend to

Page 49

1          J. Z. Rigos
2  send that to Mr. DiSpirito and ask him to
3  pay it?
4      A.    Correct.
5      Q.    If we can go back to Rigos 204.
6      A.    Yes.
7      Q.    This is a November 13, 2014
8  E-mail from you to Mr. DiSpirito and W.
9  Randolph.  You say there, Rocco/William,
10  the guarantee and indemnification look
11  good.  Please send me the versions for
12  which you would like my signatures, and I
13  will turn them right around.
14          Do you believe that you were
15  referring to the indemnification of you by
16  Mr. DiSpirito?
17     A.    Yes.
18     Q.    If I understand your testimony,
19  you believe you signed and executed such a
20  document, but you can't find a copy of it?
21     A.    Yes.
22     Q.    Have you asked Mr. DiSpirito for
23  it?
24     A.    I have not asked him of late for
25  that.  No.

13 (Pages 46 - 49)

Page 50

1          J. Z. Rigos
2    Q.    Did you ever ask him for it?
3    A.    I may have asked then for his
4  signed copy. I'm assuming somehow it was
5  conveyed. But no, I don't recall
6  specifically asking for it.
7          MR. BRADHAM: I don't think I
8  have really anything else. Let me take
9  a minute or two and look over my notes
10  to see if I have anything else at this
11  point.
12          Off the record.
13          (Whereupon, a discussion was
14  held off the record.)
15          (Whereupon, a short recess was
16  taken.)
17          MR. BRADHAM: I don't have any
18  further questions.
19          Do you have any questions?
20          [Continued on the following page
21  to allow for signature line and jurat.]
22
23
24
25

Page 51

1          J. Z. Rigos
2
3          MR. MORICI: I have no
4  questions.
5          MR. BRADHAM: We can go off the
6  record.
7          (Whereupon, a discussion was
8  held off the record.)
9          (Whereupon, at 12:03 p.m., the
10  Examination of this witness was
11  concluded.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 52

1
2        A C K N O W L E D G M E N T
3
4  STATE OF NEW YORK  )
5                      :ss
6  COUNTY OF          )
7
8        I, John Z. Rigos, hereby certify that
9  I have read the transcript of my testimony
10  taken under oath in my deposition of
11  July 13, 2022; that the transcript is a
12  true and complete record of my testimony,
13  and that the answers on the record as given
14  by me are true and correct.
15
16
17  _____
18        JOHN Z. RIGOS
19
20  Signed and subscribed to before me this
21  _____ day of _____, 2022.
22
23  _____
24  Notary Public, State of New York
25

Page 53

1
2        LITIGATION SUPPORT INDEX
3  WITNESS    EXAMINATION BY        PAGE
4  J. Z. Rigos   Mr. Bradham        4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 54

1
2          EXHIBITS
3  PLAINTIFF'S
4  EXHIBIT      DESCRIPTION        PAGE
5  EXH 1        Lease          18
6  EXH 2        Declaration        30
7  EXH 3        E-mails and draft
8              document        47
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 56

1
2          C E R T I F I C A T E
3
4      I, Maryann Laub, a Notary Public in
5  and for the State of New York, do hereby
6  certify:
7      THAT the witness(es) whose testimony
8  is hereinbefore set forth, was duly sworn
9  by me; and
10     THAT the within transcript is a true
11  record of the testimony given by said
12  witness(es).
13     I further certify that I am not
14  related, either by blood or marriage, to
15  any of the parties in this action; and
16     THAT I am in no way interested in the
17  outcome of this matter.
18     IN WITNESS WHEREOF, I have hereunto
19  set my hand this 27th day of July, 2022.
20
21
22          *Maryann Laub*
23          M A R Y A N N   L A U B
24
25

Page 55

1
2          ERRATA SHEET
              VERITEXT/NEW YORK REPORTING, LLC
3              1-800-727-6396
4  330 OLD COUNTRY ROAD        1250 BROADWAY
    MINEOLA, NEW YORK 11501      NEW YORK, NEW YORK 10001
5
6  NAME OF CASE:  Cuculich v. Rigos
    DATE OF DEPOSITION:  July 13, 2022
7  NAME OF DEPONENT:  John Z. Rigos
8  PAGE    LINE (S)    CHANGE        REASON
9
10
11
12
13
14
15
16
17
18
19
20
21
22          JOHN Z. RIGOS
23  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS      DAY OF        , 20  .
24
25  _____        _____

15 (Pages 54 - 56)

**&**

& 2:6,11

**0**

000 20:3
000002 18:19
000032 18:19
20:14

**1**

1 18:16,21 54:5
1-800-727-6396
55:3
10001 55:4
10022 2:8
10028 4:13
10165 2:13
11501 55:4
11:02 1:12
12 19:5
1250 55:4
12:03 51:9
13 1:11 49:7
52:11 55:6
150 18:8
150,000 42:4
17 30:23 31:15
18 8:5 54:5
1:21 1:9

**2**

2 30:22,25 31:17
54:6
20 55:23
200s 20:17
2014 14:22 17:16
18:18 49:7
2020 33:15 41:13

**2021** 19:5 30:23
31:15
**2022** 1:11 52:11
52:21 55:6
56:19
**204** 46:23,24
47:3,16 49:5
**210** 47:17,18
**211** 47:4,16,17
**2450** 2:12
**25** 23:8,9
**26** 23:10
**27** 26:20
**27th** 56:19
**28** 26:21

**3**

**3** 18:17 47:5,11
47:15 54:7
**30** 54:6
**32** 20:15,17,22
**330** 55:4
**37** 23:7,9
**37.1** 23:18
**37.6** 26:20 27:15
**37.6.** 26:14 27:2
29:10

**4**

**4** 53:4
**42nd** 2:12
**444** 2:7
**45** 4:12
**47** 54:8
**4th** 2:7

**5**

**5249** 56:22

**6**

60 2:12
6753 1:9

**8**

85th 4:12

**9**

99.9 38:22
9d 4:13

**a**

a.m. 1:12
able 30:3 46:9
46:10
absolutely 11:21
23:19
accommodating
42:19
accommodation
28:7
accrued 41:12
accurate 17:21
21:4
acknowledge
42:23 46:17
acquire 9:11
acquired 38:3
acrimony 25:5
action 1:17
31:25 48:2,17
56:15
actual 41:19,20
48:9
adequate 27:10
ago 5:6,12 10:2,2
42:8 43:5 45:17
agreed 3:3,8,12

agreement 1:20
18:17 47:8,20,22
47:25
ahead 18:16
23:14
alleged 41:10
allow 50:21
amended 32:6
41:6
ample 25:12
andrew 33:18
36:17
angry 16:23
annoyed 44:3
answer 24:22
answers 52:13
anybody 46:13
apartment 4:12
18:2
appearances 2:2
appeared 18:12
36:20 37:12
appears 41:9
47:7
apply 37:21
appropriate
25:4
areas 7:22
arose 48:6
arrears 41:12
article 23:7,9
asked 5:24 12:25
15:15 29:24
48:19 49:22,24
50:3
asking 4:21
20:18 50:6

**assume** 40:6
46:8 47:24 48:4
48:10
**assumed** 18:9
**assumes** 27:2
**assuming** 34:19
37:3,5,8,21
38:12,24 41:17
50:4
**assumption**
37:25
**assurances**
29:25
**assure** 16:6
25:23
**assuring** 12:9
16:12
**astoria** 22:23
**attached** 19:4,24
**attending** 2:4
**attorney** 6:11
14:16 48:20
**attorney's** 48:17
**attorneys** 2:7,12
**aurify** 7:6
**avenue** 2:7
**avoid** 25:5
**aware** 45:4

**b**

**b** 21:10
**back** 14:21
17:16 20:17
49:5
**background**
30:7
**bankrupt** 9:12

**bankruptcy** 9:15
**barely** 15:9
**based** 32:2 33:19
41:10
**basically** 11:24
**basis** 22:20
27:12 35:5,18
37:16 38:2
40:22 41:14
**bates** 18:18
19:10 20:8,10
46:22
**bearing** 27:6
**beet** 9:9
**began** 14:22
**behalf** 17:13
**belgian** 9:11
**belief** 26:6
**believe** 9:12
10:14 11:16
13:24,25 14:12
14:22 16:20,23
17:20 18:8,11
20:25 22:2,12,19
22:19,21,23
24:13,16 26:10
27:14 34:8,8,23
35:12,15 36:5,23
36:24 37:17
40:12,15 46:17
47:19 49:14,19
**believed** 17:23
18:10
**believing** 35:7
**better** 9:18
**beverage** 33:16
35:24 36:15,22
38:19

**beyond** 13:4
**big** 9:16 34:2
**blood** 56:14
**book** 32:13
**books** 18:3 32:4
32:10,11
**bottom** 20:2
**bought** 9:13
**bradham** 2:6,9
4:7,17,19 18:15
24:25 25:11
30:21 33:4 47:2
50:7,17 51:5
53:4
**brand** 6:20,23
**brands** 6:20 7:6
7:20 9:4,5,9
39:9
**bread** 9:8
**break** 29:9
**brings** 23:13
**broadway** 55:4
**brooklyn** 7:24
**brown** 2:6
**build** 15:5,11
**building** 10:3,15
**business** 5:10
6:14 7:9 8:4,11
8:17,23 10:4,10
10:11,14,24 11:3
14:24 15:5,12,22
21:12,14,16,17
21:18,20 22:5
28:18 30:2,18
38:23 39:5,11
40:10 43:2

**c**

**c** 52:2 56:2,2
**call** 12:17,19
13:16 16:22
43:11,13,21
**called** 7:18 42:15
44:23
**calls** 45:9,13
**calorie** 10:8
**care** 30:4 45:7
**case** 5:7,15,17
10:22 11:12
12:22 13:13,22
14:12,17 31:16
55:6
**casual** 7:18,19
**category** 7:20
**caveats** 24:19
**cease** 36:25
**ceased** 33:15
36:14 38:18
**celebrity** 15:25
17:17,25 29:19
**certain** 33:22
**certainly** 15:20
**certification** 3:6
**certify** 52:8 56:6
56:13
**challenged** 48:13
**challenges** 4:25
**chance** 5:14
**change** 55:8
**chefs** 17:25
**circumstances**
27:5 32:2
**city** 6:4 7:23
22:24 39:9

clear  28:3,14,15
  31:14 35:25
  42:18
clearly  4:23 5:2
client  10:5
clients  22:14
coaching  25:2
collection  47:5
collectively  24:2
  24:7,9
combination
  35:7
come  9:23 18:7
  34:13
commercial
  22:22 34:9,10,12
  34:14 35:8,13
  36:12,25 37:6,14
  37:18,23 38:4,5
  39:4,10,14,17,18
  39:24 40:3
commissaries
  39:13
commissary
  15:5
communications
  12:16,22 14:13
  32:21
company  6:18
  7:2,5 9:2,11,12
  36:22 37:14
complaint  32:6
  41:7
complete  52:12
completed  25:13
compliance  8:21
complied  24:13
  24:17 26:2

27:14
comply  33:17
  36:16
concluded  51:11
condition  27:4
  29:12,15
conditions  24:21
connection
  32:15,18
constructive
  42:20
consumes  43:2
consumption
  36:6
contested  48:13
context  11:15
  13:8 32:14
continued  50:20
continuing  27:12
conversation
  29:24 40:12,19
  45:23
conversations
  12:14 35:10,11
  42:9,12,16 43:7
  44:2,15
conveyed  35:12
  50:5
conveying  32:22
copy  4:15 19:11
  31:4 46:16,18
  49:20 50:4
cordial  44:3
correct  9:13
  10:21 14:15
  17:18 22:4,9
  23:5 33:24,25
  34:23 35:3

37:11 39:21
  40:2 41:4 46:12
  49:4 52:14
counsel  1:21 3:4
  4:14 12:25
  14:14 19:8
country  55:4
county  52:6
couple  14:10
  23:15
course  16:11
  28:13
court  1:2 3:16
  6:6 25:24
covered  16:9
  37:6 48:23
covid  37:12
creditworthiness
  17:5
creditworthy
  16:7
crystal  28:3
cuculich  1:3,4
  32:7,8 35:10
  42:10 44:8,18
  55:6
cuomo  33:18
  36:17
cursory  21:5
customers  9:19
  10:20 22:8
  33:23 34:6,13
  36:6 39:20
cv  1:9

| d |
| --- |

d  21:10 52:2

d.c.  7:25
daily  9:8
damages  41:10
date  1:18 18:22
  31:2 47:12 55:6
dated  18:17 19:5
  30:23
day  8:24,24 10:6
  52:21 55:23
  56:19
deal  16:10 17:13
  28:4 42:21
dealing  11:16
  17:10 28:20
declaration
  30:22,24 31:11
  31:16 32:5 54:6
deduction  23:21
default  41:11,20
  41:21
defendant  1:8,16
  2:12 11:13,19
  31:24
defense  48:4
definitively  34:7
  37:4 40:18
delicious  21:11
deliver  10:17,20
  22:14
delivering  33:23
delivers  22:7
deponent  55:7
deposed  5:24
deposition  3:6
  3:13 4:18 5:5
  6:10 25:6,12
  52:10 55:6

description   54:4
desperately   44:4
destroyed   17:4
details   45:3
diet   10:3,9,18
difference   34:2
different   6:19
    40:4
diligent   27:8
disclose   15:17,24
    28:8 29:19
discuss   40:8
discussed   6:9
    11:12 14:17
discussion   33:7
    50:13 51:7
dismiss   32:6
dispirito   7:13
    9:21 10:25
    11:14 13:7
    14:18 21:11,21
    27:22 30:15
    43:3 44:19
    45:15,25 46:7
    47:23 48:3 49:2
    49:8,16,22
displeasure
    11:18
dispute   46:14
district   1:2,2
document   19:14
    20:11,20 23:6
    31:7 32:24 46:5
    46:9 47:7,10
    49:20 54:8
documents
    46:22

doing   4:24 11:25
    12:10 17:14
    23:4 25:22
    33:21
dollars   45:3
draft   47:6,7,10
    47:21,24 54:7
drinking   33:13
    35:22
drinks   36:6
due   23:23,24
    41:17
duly   4:3 56:8

e

e   2:12 12:15,21
    13:6 14:11,13
    19:23 32:14,17
    32:21 47:6,9
    49:8 52:2,2 54:7
    56:2,2
earlier   22:3
east   4:12
eating   33:13
    35:22
economic   28:15
effect   3:15
eight   10:2 43:4
either   56:14
embarrassing
    14:19,20 16:3,16
emergency
    33:17 36:16
encompassed
    37:18
ensure   6:23
entered   21:3

entire   23:15
    26:14 44:5
entirely   26:7
entitled   1:17
entrepreneurial
    15:11
environs   8:2
equation   8:23
equipment   34:15
equipped   35:13
errata   55:2
es   56:7,12
esq   2:9,14
establishment
    33:14 35:23
    38:10
everybody   16:2
    37:19
examination
    1:15 4:6 51:10
    53:3
examined   4:5
executed   49:19
executive   33:17
    36:16,18 37:6,17
exh   54:5,6,7
exhibit   18:16,21
    30:22,25 31:17
    47:3,5,11,15
    54:4
exhibits   54:2
existence   46:14
expert   8:18
expertise   8:22
explained   43:8
explanation   29:3
expound   28:10
    28:12

expressed   11:18
    35:20
expression   13:5
expressly   23:19
extent   24:19
extract   11:8

f

f   7:7 56:2
facilities   38:11
    38:24
facility   22:11
    36:10 38:5,6,9
    38:12,15 41:3
facts   31:25
fair   8:9 11:17
familiar   8:15
    19:13,15 31:6
familiarity   8:19
family   1:4 17:12
    32:8 42:25
fan   9:16
fantastic   9:17
fast   7:18,19
favor   15:6 16:5
    43:19
fbo   1:4 32:8
feel   28:13
fees   48:17,20
filed   31:16 48:2
files   32:15,17
filing   3:5
finalized   46:6
finances   17:18
    17:22 29:20,22
financial   27:4,11
    27:25 29:12,14
    29:25 30:6,7

financially    16:7
financials    15:17
  15:24 16:3 28:9
find    29:4 46:9,10
  49:20
first    4:3 23:15
  23:16 24:14
  26:17,25 31:22
  33:11 42:14
  45:9
fitness    21:13
  22:7 33:22 34:3
five    6:3 7:18 9:3
  42:16
flavorworks
  21:10 33:13,15
  36:14 37:22
  38:18 41:11
floor    2:7
following    50:20
follows    4:5
food    10:16 33:16
  34:14 35:24
  36:5,15,21 38:10
  38:19
foods    10:19 22:7
  33:22
fooled    27:18,20
  27:23 28:25
  32:23
force    3:14
form    3:9
former    33:18
forth    32:2 56:8
found    15:2 22:22
four    41:6
free    26:14 28:13

friedman    2:6
friend    9:24 15:9
  17:10,12 28:17
friendly    42:20
front    19:7 20:11
  20:21
frustration    13:5
fully    35:13
functional    34:15
further    3:8,12
  50:18 56:13

## g

g    4:2 52:2
general    40:23
generally    19:13
  19:15
gerard    2:14
give    20:8 43:23
  45:25
given    14:14 21:5
  52:13 56:11
go    5:3 18:15
  19:19 20:20
  23:6,7,14 26:13
  31:22 33:9 39:6
  41:5 46:20,23,24
  47:16 49:5 51:5
going    12:3,12,20
  13:11 15:3,4
  22:24 23:3,14
  26:24 31:19
  43:14 44:25
  45:21 47:2
  48:10
good    15:6 49:11
gotten    48:21

government
  8:16 36:9
governor    33:18
  36:17
grand    18:8
great    15:3
guarantee    15:14
  15:15 16:5,11,18
  23:12,16 26:3,5
  42:23 49:10
guaranteed
  24:10 27:8
guarantees
  23:20
guarantor    10:23
  19:21 23:2,18
  27:2 30:13 46:2
guess    5:24 11:6
guessing    5:13
  9:25
guy    15:10 18:7
  28:22 43:14,15
  43:15,21
guys    6:4 7:19 9:3

## h

h    4:2
hand    56:19
handful    28:25
happen    16:9
happened    38:8
  41:2 43:9
happening    12:19
  13:10,25 16:24
  40:24
happens    22:11
head    13:3

hear    12:6
held    1:17 33:8
  50:14 51:8
hell    43:14
help    20:9 42:20
  44:15
hereinafter    24:9
hereinbefore
  56:8
hereto    3:5
hereunto    56:18
hey    15:2
hit    36:21
hold    19:22 20:15
  20:18
home    28:23
honest    19:17

## i

i.e.    48:12
idea    43:15
identification
  18:22 31:2
  47:12
immediately
  45:12
includes    41:11
incredibly    16:15
  17:11 42:19
indemnification
  48:14 49:10,15
indemnify    46:18
  48:4
indemnity    46:2
  47:8,20,22
index    1:9 53:2
individual    39:19

individuals 40:4
information
  11:8 27:11
informed 27:4
  29:11
inquiry 27:9
  29:21
instructing
  25:20
intend 48:22,25
inter 1:3 32:7
interest 28:16,18
  28:21 39:11
interested 56:16
interesting 14:24
interim 25:16
introduced 9:24
invoice 48:21,25
invoices 48:23
involved 5:20
  11:20 12:2
  13:24 43:24
  45:2
involvement
  14:25 30:15,17
irrevocably
  23:20
island 22:24
issue 6:2 10:12
  15:13 16:8 17:2
  17:3 18:10
issued 33:18
  36:17

**j**

j 4:2 5:1 6:1 7:1
  8:1 9:1 10:1
  11:1 12:1 13:1

14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 53:4
john 1:7,16 2:9
  4:10,19 19:6
  20:6 26:19
  28:10 31:11
  45:6 46:13 52:8
  52:18 55:7,22
jointly 23:21
july 1:11 19:5
  52:11 55:6
  56:19
jurat 50:21

**k**

k 52:2
keep 29:11
keeping 27:3
keeps 12:9
kept 44:25
kind 25:6 29:9
kinds 14:10 45:9
kitchen 15:5
  22:14,22 34:9,11
  34:12,14 35:8,13
  36:12,25 37:23
  38:4,6 39:10,24

40:3
kitchens 37:7,14
  37:18 39:4,8,14
  39:17,19
kits 22:25
know 6:22 9:20
  9:23 12:4,8,11
  13:20 15:24
  18:13,14 21:15
  21:18 28:2,22
  29:14 34:7,18
  35:18 36:4,11
  37:4,19 38:2,10
  38:14,16,20,23
  39:3,9,11 40:19
  40:21 41:19,20
  41:23 44:10
  45:16
knowledge 21:19
  21:24,25 31:25
  32:3 36:8 41:2
  42:5
knowledgeable
  8:10
knows 16:2

**l**

l 52:2
l.l.p. 2:6,11
landlord 15:16
  23:25 24:4 28:9
  32:9 41:9,24
  44:22 45:9
landlord's 41:6
language 24:20
  24:21,23
late 49:24

laub 1:18 56:4
  56:23
lawful 23:22
lawsuit 10:13
  11:19 12:11
  23:13 30:14
le 9:7,10 38:3
leaders 6:23
lease 10:23
  14:23 16:15,17
  18:17,20 19:3,12
  21:6,7 23:25
  24:5 26:21 28:7
  29:17 30:12
  46:3 54:5
leases 19:16
letter 19:4,5 42:3
liable 26:8
lied 16:25 27:19
life 15:20 21:11
  42:25
liked 15:10
line 50:21 55:8
literally 28:19
litigation 53:2
little 9:9 22:3
  32:20
lived 17:25
  40:20
llc 21:10 55:2
location 15:3
locations 6:21
  7:25
long 6:16 8:3
  19:10 22:23
longer 25:7
look 19:17 20:18
  21:6,8 49:10

50:9
**looked** 19:16
**looking** 19:12
20:16 23:7 42:4
47:15
**looks** 19:24
**lose** 10:8
**loss** 10:3,19
22:13 33:25
34:3,4
**lot** 5:3 24:20
25:7 27:21
**low** 10:7

**m**

**m** 52:2
**madison** 2:7
**mail** 12:21 13:6
14:13 49:8
**mails** 12:15
14:11 19:23
32:14,17,21 47:6
47:9 54:7
**making** 10:15
28:6 33:21
48:22
**management**
5:19,22 7:3 10:4
**manhattan** 6:5
7:24 40:20,25
**march** 33:15
36:21 41:12
**mark** 30:22
**marked** 18:21
30:25 47:10
**marking** 31:17
**marriage** 56:14

**maryann** 1:18
56:4,23
**material** 13:4
**matter** 4:20
56:17
**meal** 10:7 22:25
**meals** 10:6 22:12
**mean** 13:17
21:18 34:10
44:10
**meaning** 45:19
46:15
**means** 9:8 27:10
**mechanics** 8:24
**melt** 9:9
**mentioned** 6:13
9:3 42:8
**met** 28:24
**middle** 36:21
**mind** 28:12
**mineola** 55:4
**minute** 42:8 50:9
**model** 14:24
**money** 23:23
24:6
**moneys** 23:24
**month** 10:7
45:17
**morea** 2:6
**morici** 2:11,11
2:14 4:16 20:2,6
24:18 25:8 33:6
51:3
**morning** 31:13
**motion** 32:5
**move** 43:4
**multiple** 6:21
18:3 35:11

**mutual** 9:24

**n**

**n** 4:2 52:2,2
**name** 4:8 5:15
5:25 7:2,5 21:15
21:17 55:6,7
**nature** 44:14
**necessarily** 8:24
34:3
**need** 10:6 15:13
19:11 25:7
**needed** 13:9
**needless** 25:5
**never** 16:10
22:10,15 26:8
28:4,17,18,23,23
30:4 32:24 35:2
43:16 45:2,10
**new** 1:2,19 2:8,8
2:13,13 4:13,13
6:4 7:21,23 8:13
8:17 15:9 39:9
52:4,24 55:2,4,4
55:4 56:5
**nice** 15:10 18:2
**nomenclature**
38:7
**non** 24:7,8 27:6
27:7
**notary** 1:19 3:14
4:4 52:24 56:4
**notes** 50:9
**notice** 12:18
**notified** 13:9
**notwithstanding**
42:22

**november** 18:17
30:23 31:15
49:7
**number** 20:8
23:10
**numbers** 20:4,16
43:17

**o**

**o** 4:2,2 52:2
**oath** 52:10
**object** 25:17,17
**objection** 24:18
**objections** 3:9
**obligation** 46:15
**obligations** 24:2
24:4,7,8,9,11
27:8 30:4
**obtain** 30:6
**obtaining** 27:10
**obvious** 48:12
**obviously** 24:22
**occasional** 13:5
**occupation** 6:16
**occurred** 41:21
**offensive** 17:11
**okay** 16:12 17:7
20:15,22 43:20
45:7
**old** 55:4
**once** 5:6
**operate** 8:17
36:10 37:14
39:10
**operated** 35:16
**operates** 33:13
38:4

| | | | |
|---|---|---|---|
| **operating** 6:24 10:12 22:5 30:18 36:3 40:14 | 26:13,15,18,20 27:15 29:10 31:23 33:9,12 35:21 36:13 37:10 38:17 40:23 41:5 | **plaintiff** 1:5 2:7 4:20 32:6 | **proactively** 39:6 |
| | | **plaintiff's** 18:21 30:25 47:11 54:3 | **probably** 13:15 15:18 42:16 45:8,17 |
| **operations** 5:21 8:25 37:2,20 | **part** 5:18,22 6:18 7:3,8,11,13 | **plan** 10:9 | **problem** 44:15 |
| **opportunity** 25:13 | **particular** 8:13 13:4 | **please** 4:9 13:18 13:25 29:8 45:7 49:11 | **process** 9:15 10:3 |
| **opposed** 39:18 | | | **produce** 22:13 22:24 34:16 |
| **ordering** 4:15 | **particulars** 45:3 | **point** 26:9 40:12 40:16 43:18 48:22 50:11 | |
| **orders** 33:17 36:16,18 37:6,18 | **parties** 2:4 3:5 56:15 | | **produced** 19:9 20:7 46:22 |
| | | **portfolio** 5:19,23 6:19 | **produces** 22:12 |
| **outcome** 56:17 | **partner** 28:18 | | |
| **oversee** 6:21 | **party** 5:17 30:5 | **pose** 4:25 | **production** 19:9 20:20 38:5,6,9 |
| **oversees** 5:23 | **pay** 41:16 43:14 43:14,15 48:19 49:3 | **position** 17:5 | |
| **owned** 21:20 | | **possible** 12:10 | **products** 34:4,16 |
| **owner** 7:8,13 | | **predicament** 29:4 | **program** 10:7 |
| **owners** 7:11 21:23 | **paying** 43:12 | | **progress** 12:5,8 |
| | **payment** 23:22 24:2,6,7,8,8 27:6 | **predicated** 26:6 | **promise** 44:24 |
| **owns** 5:19 6:19 9:3 | | **premises** 10:12 10:19 22:6,16 23:4 30:19 33:14,16 34:6 35:23,24 36:15 38:18 | **prompt** 23:22 24:3 |
| | **pending** 25:2,3 25:21 | | **prompted** 45:18 45:19,20 |
| **p** | **people** 8:20 27:21 38:22 39:7 | | **proper** 24:3 |
| **p.m.** 51:9 | | | **provide** 10:5 12:25 |
| **package** 10:17 | | **prepare** 10:18 | |
| **page** 19:19,23 20:13 21:9 23:8 23:9 26:20 31:19 50:20 53:3 54:4 55:8 | **percent** 38:22 | **prepared** 36:5 | **provided** 12:24 32:19 |
| | **performance** 6:22 24:3 27:7 | **prepares** 22:6 | **provision** 27:15 |
| | | **preparing** 33:22 | **public** 1:19 3:14 4:4 52:24 56:4 |
| | **period** 41:7,24 | **presently** 4:11 | |
| **pages** 19:25 | **periodic** 12:17 | **presumably** 39:23 | **pursuant** 1:20 23:25 24:5 |
| **paid** 43:16,16 44:24 48:16 | **permits** 8:16 36:9 | **pretty** 18:6 | **pursuing** 10:10 |
| **pain** 9:7,10 38:3 | **permitting** 8:20 | **previously** 21:2 21:13 33:19 | |
| **pandemic** 9:14 17:3 36:20 39:5 | **persist** 25:22 | | **q** |
| | **personal** 32:3 | **primarily** 7:17 7:23 12:17 | **question** 3:10 24:12,22,25 25:3 25:10 27:13 |
| **paragraph** 23:18 24:24 25:9 | **phone** 12:13 | | |

**questions**   4:22
    11:7 25:14,14,18
    25:19,21 29:7
    50:18,19 51:4
**quicker**   5:3
**quotidien**   9:8,10
    38:3

**r**

**r**   4:2 7:7 56:2
**randolph**   49:9
**range**   9:7
**read**   23:14,15,16
    24:14 25:8 26:4
    26:14,16,24
    27:16 31:13,23
    33:10 52:9
**reality**   33:3 43:9
**really**   6:25 12:11
    16:2 18:12 50:8
**reason**   22:21
    35:15 55:8
**recall**   5:18,25
    13:2 40:11
    42:13,14 45:15
    45:22 48:7,9,12
    50:5
**received**   48:24
**recess**   50:15
**recited**   16:21
**record**   4:8 23:14
    26:17,24 31:14
    33:6,8 50:12,14
    51:6,8 52:12,13
    56:11
**records**   32:4,11
    32:11,14

**recover**   41:9
**refer**   32:10
**referred**   24:10
**referring**   19:2,3
    21:13 36:19
    39:16 49:15
**regarded**   17:25
**regarding**   29:22
**regret**   32:25
**related**   22:7
    56:14
**relating**   24:6
**release**   17:18,22
**relied**   27:17
**remember**   5:7
    5:14 40:18 44:7
    44:13,14
**remote**   1:15
**remotely**   2:4 4:4
    4:24
**remove**   12:10
    44:4
**rent**   41:8,16,23
    44:24
**reporter**   4:14
    18:23 31:3
    47:13
**reporting**   55:2
**represent**   4:19
**represents**   27:9
**required**   8:16
    36:25
**requires**   36:12
**reserved**   3:10
**reside**   4:11
**resolve**   13:25
**resolving**   45:5,6

**respective**   3:4
**responded**   11:22
    14:3,4
**responds**   11:24
**response**   48:7,10
    48:12
**responses**   14:7
**responsibility**
    27:3
**responsible**   26:7
**restaurant**   5:9
    5:20,21 6:2,14
    6:20 7:19 8:4,7
    8:10 34:22,24
    35:5,9,16 36:2
    36:22 37:20
    39:22
**restaurants**   5:12
    5:23 6:4,22,24
    7:15,18,21 9:2
    37:12,13 39:12
    39:18
**reveal**   27:9
**review**   21:2,6
    32:3,12
**reviewed**   31:10
**reviewing**   32:10
**right**   20:3 25:17
    25:19 39:20
    44:6 49:13
**rigos**   1:7,16 4:10
    4:17 5:1 6:1 7:1
    8:1 9:1 10:1
    11:1 12:1 13:1
    14:1 15:1 16:1
    17:1 18:1,18
    19:1 20:1,3,14
    21:1 22:1 23:1

23:10 24:1 25:1
    25:25 26:1,21
    27:1 28:1 29:1
    30:1 31:1,11
    32:1 33:1,11
    34:1 35:1 36:1
    37:1 38:1 39:1
    40:1 41:1 42:1
    43:1 44:1 45:1
    46:1,23,24,24
    47:1,3,4,15,16
    47:16 48:1 49:1
    49:5 50:1 51:1
    52:8,18 53:4
    55:6,7,22
**risk**   27:6
**road**   55:4
**rocco**   7:13 9:20
    10:2 11:4 16:6
    16:24 21:11,17
    21:20 26:6,10
    27:17 28:16
    29:18 33:21
    35:16 38:12
    40:9 43:3,11,13
    43:22 44:4,16
    45:10 46:15,17
    49:9
**rocco's**   21:16
    28:17

**s**

**s**   4:2 55:8
**saying**   11:24
    13:23 36:24
    37:5,17
**says**   23:18 31:24

| | | | |
|---|---|---|---|
| schwartz  2:6 | 38:14,23 39:4,7 | 46:13 | statement  17:21 |
| screen  33:4 | 39:12,14,22,23 | sort  20:20 | 41:15 |
| 46:21 | 40:7,9,20 | sounds  20:19 | statements  30:7 |
| scrolling  20:17 | side  8:23 | south  18:9 | states  1:2 23:23 |
| sealing  3:5 | sign  15:14,15 | southern  1:2 | steve  42:9 43:7,7 |
| second  31:19 | 16:5,15 42:22 | space  34:15,19 | 43:18,22 44:3,3 |
| secure  28:7 | signature  19:20 | 35:2 43:20,23 | steven  1:3 32:7 |
| see  19:20,23 | 19:21 20:23,24 | speak  4:23 5:2 | 35:10,12 |
| 20:3 26:22,23 | 21:9 31:20 | 43:20 44:18 | sticking  10:9 |
| 50:10 | 50:21 56:22 | speaking  18:4 | stipulated  3:3,8 |
| seeking  41:8,10 | signatures  49:12 | specific  15:8 | 3:12 |
| 41:24 | signed  3:13,15 | 25:10 40:11,19 | stipulations  1:20 |
| seen  17:9 18:3 | 14:23 16:17 | 40:25 44:12 | 3:2 |
| 34:20 | 26:5 29:17 | 48:20 | stopped  40:13 |
| send  49:2,11 | 30:12 32:24 | specifically | strange  11:5 |
| sense  17:24 | 46:6,9,16,18 | 36:11 45:16 | strangeness |
| sent  42:3 | 49:19 50:4 | 50:6 | 11:10 |
| sentence  26:17 | 52:20 | speculating | strategy  8:23 |
| 26:25 33:11 | signing  21:7 | 18:13 | street  2:12 4:12 |
| sentences  23:17 | 32:23 | spelled  7:6 | stuff  10:16 25:6 |
| 24:14 26:3 | simple  32:22 | spend  13:14 | stupid  28:19 |
| sentiment  43:25 | simply  28:6 | spoke  40:13,16 | 29:2 43:4 |
| served  34:14 | 34:15 | 44:17 45:14,17 | stupidest  15:19 |
| service  33:16 | sit  13:20 34:13 | spoken  17:9 | 15:20,21 16:16 |
| 35:24 36:15 | site  33:24 36:7 | spot  15:4 | submit  32:4 |
| 38:19 | sitting  16:19 | spread  7:22 | subscribed |
| serving  34:5 | 17:15 | ss  52:5 | 52:20 55:23 |
| 46:2 | situation  32:22 | stairs  5:11 | subsequently |
| set  32:2 56:8,19 | 33:3 40:5 42:21 | stamped  18:18 | 30:10 |
| setoff  23:21 | 45:13 | 20:10 | substance  6:9 |
| severally  23:22 | slc  1:9 | stamps  19:10 | successful  18:6 |
| shakes  10:16 | slipping  5:11 | 46:23 | 30:3 |
| sheet  55:2 | sold  18:4 | start  25:20 | sued  41:16 |
| shop  9:9 | solve  44:15 | started  30:14 | suite  2:12 |
| short  50:15 | somebody  5:10 | starts  43:12 | summer  9:14 |
| show  18:5 | 12:18 | state  1:19 4:8 | supply  39:25 |
| shut  36:22 37:11 | sorry  17:4 26:18 | 52:4,24 56:5 | supplying  39:17 |
| 37:20 38:9,11,12 | 28:11 33:25 | | 39:19 40:4 |

support   32:5
   53:2
supported   39:13
supposed   46:18
sure   6:18 7:5
   11:9 13:23 14:4
   14:9 18:25
   21:16 32:13
   33:12 43:12
   45:18 48:5,13,22
sworn   3:15 4:3
   55:23 56:8

**t**

t   52:2 56:2,2
take   9:20 15:3
   25:7,23 26:15
   30:3 45:7 50:8
taken   1:18 5:5,8
   50:16 52:10
talk   13:16 35:22
talked   22:2
talking   31:15
team   5:19,22 7:3
tell   6:15 22:11
   26:4,10 27:24
   40:17 41:14
   42:11 43:11
   44:13,21 48:3
telling   27:18
ten   5:12 9:25
   10:2
tenant   21:9,20
   23:24 24:3 27:5
   27:7,11 29:12,23
   36:9 41:21
tenor   44:2

terms   14:11
   32:20
testified   4:5 6:6
   22:4 29:18
   33:20 34:25
   35:4 44:9
testifying   36:2
testimony   6:10
   49:18 52:9,12
   56:7,11
text   13:7,10,15
   14:8
texted   13:23
texts   13:12,21
   14:3,10 32:21
thank   29:3 48:15
thing   12:6 15:19
   15:21 16:16
   28:19 44:5
things   5:3 8:21
   15:20 18:9
think   5:2 12:23
   14:7 16:25
   27:22 34:25
   44:11 45:11
   46:12,13,21 50:7
thought   14:23
   15:9 45:12
thousand   38:25
three   33:10,12
   35:22 36:14
   37:10 38:17
   40:23
throws   9:14
time   1:18 3:10
   12:4 13:15 18:8
   21:3 26:15 30:8
   30:13,13 31:9

41:7,25 42:15
   44:16 45:14
times   28:25
today   4:18,24
   6:10 13:21
   16:19 17:15
   18:11 28:2
told   16:20 17:16
   18:3 22:22 23:3
   29:18 35:8 44:8
top   13:3
torture   29:5
tours   18:4
transcript   52:9
   52:11 56:10
trial   1:15 3:11
tribeca   18:2
tried   44:16
trii   1:4 32:8
truck   21:10
true   52:12,14
   56:10
trustee   1:3 32:7
truth   26:11
   27:18
truthful   16:21
try   4:22 25:4
trying   13:19
   15:11 29:5
   42:20 44:4
turn   49:13
tv   18:5
two   23:16 24:14
   26:3 45:13 50:9
type   7:15 8:15
typically   34:13
typing   13:15

**u**

u   7:7
unclear   41:7
unconditionally
   23:20
understand
   13:19 29:4
   49:18
understanding
   28:3 33:20
   34:21 38:8
   40:24
united   1:2 23:23
unpaid   41:8
upset   44:23
use   15:4 38:7

**v**

v   55:6
various   4:21
   42:9
vein   14:6
veritext   55:2
version   20:7
versions   49:11
victim   27:19
view   7:20
visited   22:10,15
   35:2
vivos   1:4 32:8

**w**

w   49:8 52:2
wait   11:6
waived   3:7
want   11:7 15:8
   15:23 17:18,22
   18:15 26:16
   29:9 31:22

**[want - zoom]**                                                    Page 12

|  |  |
|---|---|
| 42:18 | 6:4 7:22,23 8:13 |
| **wanted**   45:11 | 8:17 39:9 52:4 |
| **wants**   15:16 | 52:24 55:2,4,4,4 |
| 43:22 | 56:5 |
| **washington**   7:25 | **z** |
| **way**   56:16 | **z**   1:7,16 4:2,10 |
| **weight**   10:3,8,19 | 5:1 6:1 7:1 8:1 |
| 22:13 33:25 | 9:1 10:1 11:1 |
| 34:3,4 | 12:1 13:1 14:1 |
| **went**   9:12 18:9 | 15:1 16:1 17:1 |
| **whereof**   56:18 | 18:1 19:1 20:1 |
| **wherewithal** | 21:1 22:1 23:1 |
| 27:25 30:2 | 24:1 25:1 26:1 |
| **william**   49:9 | 27:1 28:1 29:1 |
| **witness**   4:2 20:5 | 30:1 31:1 32:1 |
| 25:2,20 51:10 | 33:1 34:1 35:1 |
| 53:3 56:7,12,18 | 36:1 37:1 38:1 |
| **word**   16:13 | 39:1 40:1 41:1 |
| **work**   6:23 43:11 | 42:1 43:1 44:1 |
| **worked**   8:6 | 45:1 46:1 47:1 |
| **world**   37:20 | 48:1 49:1 50:1 |
| **worry**   8:20 45:6 | 51:1 52:8,18 |
| 48:15 | 53:4 55:7,22 |
| **writing**   13:2 | **zero**   28:9,15,21 |
| **x** | 30:16 |
| **x**   1:3,10 | **zoom**   4:24 |
| **y** | |
| **y**   7:7 | |
| **yeah**   5:9 13:14 | |
| 14:9 20:22 | |
| **years**   5:6,12 8:5 | |
| 9:25 10:2 17:9 | |
| 42:17 43:4 | |
| **yep**   26:23 46:25 | |
| 47:18 | |
| **york**   1:2,19 2:8,8 | |
| 2:13,13 4:13,13 | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

```
                    VERITEXT LEGAL SOLUTIONS
          COMPANY CERTIFICATE AND DISCLOSURE STATEMENT
```

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.